Filed 11/28/11

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
            )
           Plaintiff and Respondent, )
            )         S042660
            v. )
            )
RONNIE DALE DEMENT, )
            )      Sacramento County
            Defendant and Appellant. )    Super. Ct. No. 4679510
_____ )

Defendant Ronnie Dale Dement was convicted of oral copulation in a local detention facility and of the first degree murder of fellow inmate Greg Michael Andrews. (Pen. Code,[1] §§ 187, subd. (a), 189, 288a, subd. (e).) The jury found true the special circumstance allegations of murder while engaged in the attempted commission of oral copulation and, in a separate proceeding, of a prior conviction of murder. (§ 190.2, subd. (a)(2), (17).) It returned a death verdict and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# I. FACTUAL BACKGROUND

## A. Guilt Phase

### 1. *Prosecution evidence*

On April 9, 1992,[2] Greg Andrews was found dead in the jail cell he shared with three other individuals, including defendant. Defendant was implicated in Andrews's murder by the testimony of the other cellmates, defendant's statements and actions before and after Andrews was attacked, and the testimony or statements of inmates who overheard parts of the attack.

#### a. *Andrews's arrival at the jail*

On April 8, defendant, whose nickname was "Pico," shared cell No. 8 in the Fresno County jail with John Benjamin and Jimmie Lee Bond. That evening, he was in the jail dayroom standing next to inmate Anthony Williams. About 30 minutes before the inmates returned to their cells for the night, a group of new inmates, including Greg Andrews, appeared. Referring to Andrews, defendant told Williams, "I hope they don't move him in my cell." He then said something to the effect of, "They move him in my cell, I'm going to do him" or "do his ass," which Williams interpreted to mean defendant was going to kill Andrews.

Andrews was assigned to a three-bunk cell occupied by defendant, Bond, and Benjamin. Defendant seemed upset about a fourth person being assigned to the cell. Defendant, Benjamin, and Bond inquired whether a mistake had been made placing Andrews in their cell because a cell in the tier immediately below them had only two occupants. They were informed Andrews would remain in their cell.

---

[2] All dates in the discussion of the prosecution's guilt phase evidence refer to dates in 1992 unless otherwise indicated.

2

Inmate Bradley Nelson, a friend of Andrews's, socialized with Andrews in the dayroom after Andrews had been assigned a cell. Andrews left to go to sleep. As Andrews started to go upstairs, Nelson saw defendant look at Bond, smile, and start hitting his fist into his hand. Nelson told Bond "they better leave [Andrews] alone because he was a friend of mine." Inmate Eric Johnson heard defendant say he "was going to take care of the home boy that had just been put into his tank."

### b. The attack on Andrews[3]

After the cells were locked for the night, Andrews, who was wearing only boxer shorts, put his mattress on the floor, and went to sleep. Defendant, Bond, and Benjamin drank an alcoholic beverage called "pruno." Sometime later, defendant told Benjamin and Bond he wanted to question Andrews about a woman they both knew, and that defendant "would know about him if he gave the wrong answers." Defendant, who was wearing boxer shorts and sandals, began slapping Andrews in the face to wake him up. Defendant then asked Andrews about defendant's wife, "if he knew her, how good did he know her, things like that." Andrews apparently acknowledged that he knew or had seen defendant's wife. Defendant became angry, and began punching Andrews in the face, calling him a "piece of shit," and stomping on his head. Benjamin and Bond told defendant to leave Andrews alone. Defendant started to remove Andrews's boxer shorts, and when Andrews attempted to hold on to the shorts, defendant punched him, slapped him, and told him to put his hands down. Defendant ripped off the shorts.

---

[3] This factual recitation is from Benjamin's and Bond's testimony. Their testimony did not differ materially with regard to defendant's actions and statements regarding the attack, but each person's testimony was more detailed with respect to certain aspects of the attack. "In light of the sufficiency of the evidence contentions that follow, we set forth the facts here in the light most favorable to the judgment." (*People v. Lee* (2011) 51 Cal.4th 620, 625, fn. 5.)

Defendant called Andrews a "punk," and said, "Watch him kiss my dick." Defendant pulled his penis through the fly of his boxer shorts and ordered Andrews to kiss it. Andrews refused. Defendant told Andrews, "If you just kiss it, I'll leave you alone." Andrews kissed the head of defendant's penis. Defendant said, "I ought to fuck him." Defendant asked Bond and Benjamin if they wanted to fuck Andrews "or get their dicks sucked"; they declined. Defendant backed away from Andrews, and said, "I told you he was a punk, a piece of shit," and, "I ought to kill you."

Defendant started punching and kicking Andrews. Bond unsuccessfully tried to pull defendant away from Andrews. Defendant began slamming Andrews against the cell lockers, and Bond again unsuccessfully tried to stop him. Defendant continued hitting Andrews, "slinging him into the locker, throwing him on the ground, [and] stomping on him." Andrews yelled, "Leave me alone. Why are you doing this to me?"

Defendant then grabbed a towel and wrapped it around Andrews's throat, pulling on both ends of the towel. Defendant said he was going to kill Andrews, and that it was people like Andrews who caused the death of his mother. Andrews passed out, but was still breathing. Bond pulled defendant off Andrews, and defendant told Bond "to stay out of it and mind [his] own business, that the same thing could happen to [him]." Benjamin pushed a call button to alert an officer to contact the cell. An officer's voice came over the speaker in the cell, defendant told Andrews to be quiet, and yelled out, " 'What time is it?" The officer informed defendant of the time, the two may have exchanged another word or two, and the conversation ceased.

Defendant then choked Andrews with the towel, which was still wrapped around his neck, a second time. Bond and Benjamin unsuccessfully attempted to intervene. Andrews passed out again. Defendant let go of Andrews, saying, "I

4

killed him." Bond became "real emotional" and told defendant, "You killed him. You killed him," but Benjamin could see Andrews was breathing. Benjamin said, "No, he's alive, he's not dead. You guys didn't kill him. It's all right." Defendant then jumped back onto Andrews and choked him a third time. Finally, defendant said, "Fuck it, I'm through with it," and released the towel. Benjamin now thought Andrews, whose face color began to darken, was dead.

Defendant instructed Bond and Benjamin to clean up the cell. Andrews was placed on a mattress, covered with a blanket, and moved underneath the bottom bunk. The cellmates wiped up blood, and flushed boxer shorts and towels down the toilet. Defendant also told them that "when the police ask about it, just to say that him and Mr. Andrews got in a fight and that we went to bed and we didn't know what happened." About 40 minutes to an hour after the third choking, the cell doors were opened for breakfast. Defendant, Bond, and Benjamin exited the cell.

Defendant later told Bond and Benjamin "not to say anything . . . or something would happen to us." Bond and Benjamin subsequently returned to the cell, shut the door, pushed the call button, and notified the officer that there was a body in the cell. A responding jail nurse testified that when she examined Andrews there was a towel wrapped around his neck and he had no heartbeat or pulse.

During the night of April 8 to 9, inmate Albert Martinez heard "somebody calling for help, screaming 'Just leave me alone,' and . . . what sounded like a body being thrown against a wall and the toilet." Martinez also heard a voice call out something to the effect that "he wanted to fuck him and stuff." Nelson heard fighting, and heard Andrews plead, "Somebody, please get me out of this cell," and later say, "You might as well go ahead and kill me."

5

### c. Evidence after the attack on Andrews

Nelson went to Andrews's cell to wake him for breakfast. He discovered Andrews was dead, and returned to his cell, informing his cellmates of what he had observed. Defendant arrived at Nelson's cell. Defendant was aware Nelson had been in cell No. 8, "was mad," and "told me to stay the fuck out of his cell." Defendant then asked Nelson if he would help him drag the body out of the cell onto the tier. Nelson declined. Defendant knew Nelson and Andrews had been friends, and said that if Nelson said anything, he would be dead. Defendant placed his left hand on Nelson's chest and with his right hand drew his finger across his throat.

Williams testified that as soon as the cell doors were opened for breakfast, he observed defendant calmly "going from cell to cell letting everybody know if they got any knives or weapons, to get rid of them because he had killed a guy upstairs."

Inmate Martinez, who was an acquaintance of defendant's, heard defendant bragging about having "killed the punk." Defendant visited Martinez's cell and asked Martinez to help him drag a body downstairs. Martinez declined. Martinez later heard defendant ask other inmates to remove the body from his cell, and heard defendant describe the attack on Andrews. Defendant said he beat Andrews, and Martinez was "pretty sure [defendant] mentioned that he was choking him, strangling him." Martinez heard defendant say that "he was trying to go up in the guy," which Martinez said meant, "trying to fuck him." Martinez was uncertain whether defendant said "he had fucked the guy" or that "he had killed him because he didn't want to let him fuck him." According to Martinez, defendant told him and other inmates that if he "got rolled up, the two people that knew what had happened were his two cellies and that they needed to do something to him."

6

On the morning Andrews's body was found, Criminalist Michael Giberson physically examined defendant. There was a one-and-one-half inch diameter red and swollen area on defendant's right middle knuckle and an abrasion and cut on the web portion near his right thumb. The back of the web on his left hand also bore a small abrasion. The outside edge of his right big toe was bruised and there was a bruise on his left shin about six inches below the knee.

Fresno County Sheriff's Department Detective Bradley Christian accompanied defendant to the hospital so that he could receive medical treatment for his injured hand. During informal conversation, Christian mentioned defendant's wife and a friend of hers named Tom Rutledge. Defendant said he knew Rutledge, that he and Rutledge were enemies, and that Rutledge had disrespected him. Defendant subsequently asked Christian "what the name of the subject was that had gone to sleep." Christian said, "Greg Andrews." Defendant nodded his head and said, "He was a friend of Tommy's."

In March and April 1993, defendant sent inmate Trinidad Ybarra "kites," or jailhouse letters, portions of which were read to the jury. (See *post*, pt. II.B.3.) In the kites, defendant appeared to admit responsibility for Andrews's murder.

An autopsy revealed blunt trauma injury to Andrews's head and body. Four of his ribs had been fractured by blunt trauma; these injuries were more consistent with a kick than a blow from a fist. His frenulum, or the string attaching the upper lip to the jaw area, was torn, and his hands bore defensive wounds. There was a horizontal abrasion on the front and sides of his neck. The blunt trauma injury contributed significantly to Andrews's death, but the cause of death was ligature strangulation.

## 2. *Defense evidence*

Donald Moore, Anthony Williams's parole agent, testified that he had advised Williams that if a subpoena were issued for defendant's Fresno trial, it would be in Williams's best interest to satisfy his obligations under the subpoena before moving to Southern California. Once Moore learned Williams was going to have to testify, Moore told Williams that "as soon as he got finished testifying . . . , he could come back to my office and we'd go ahead and give him the paperwork and he could head on down to Palmdale." Moore wrote a note in Williams's file that read: " 'Advised would not release suspect to Palmdale area if he did not cooperate with their investigation.' " The note, however, referred to a conversation Moore had with the district attorney's investigator. Moore did not tell Williams he could not go to the Palmdale area unless he cooperated.

Dr. Eric Hickey, a criminologist at the California State University, Fresno, testified as an expert concerning prison argot or slang. According to Dr. Hickey, prison slang included a great deal of machismo and bravado, and it was very common for inmates to exaggerate or falsify their past exploits in order to attain status. "No one wants to appear to be weak in an institution because the weaker ones are the ones who are preyed upon."

Dr. Hickey testified that the term "tag" had a variety of meanings. These included to kill, physically assault, or hurt an individual in some way. If used in reference to a family member, it could mean to silence that individual so he would not speak about other offenses. If used in reference to a stranger, it could mean to let that individual know the speaker is in charge, or is the boss, perhaps by a sexual assault. The term "I'm going to do him" could have a sexual connotation. The term "punk" usually meant "somebody who is used sexually, he's owned by another inmate, . . . sometimes shared or sold to other inmates."

Dr. Hickey also testified that although the threat of sexual attack is used to intimidate another inmate, there may be no intent to actually commit such an assault. Sexual assaults were sometimes used to punish a fellow inmate.

Dr. Hickey agreed with defense counsel that depending on the relationship between two inmates, inmates can use kites to "try to puff themselves up and . . . make themselves more . . . fearsome than they already are." If the writer is friends with the recipient of the kite, "he may say very confidential things to him." If the writer is just an acquaintance, "he may say things which are somewhat embellished."

Fresno County Sheriff's Department Detective Linda Lee testified that on April 9, 1992, the day Andrews's death was reported, she interviewed Anthony Williams. Williams indicated he did not want to say anything unless Lee could help him with his case. Lee did not make a deal with him. After further conversation, Williams said he was not going help Lee unless she helped him, and that he knew who had committed the crime but would not tell her. Lee explained she was not in a position to help Williams.

In June and July 1994, Irvin Basquez was at times in a holding cell in the court building in which defendant's trial was being held. On one such occasion in the week or two before Basquez's testimony, a man who had short hair and a mustache coming down the sides of his mouth was being held in the cell next to Basquez's. The man was yelling loudly at police officers and identified himself as "Bond." Some female inmates were brought through and one of the women asked Bond, "What are you in here for?" Bond replied, "Killing my cellie." The woman responded, "Scared of you," and left. Basquez was aware Bond was a witness in a related case in federal court. He subsequently conveyed the conversation to defendant, with whom he was acquainted.

9

## B.  Prior-Murder Special-circumstance Allegation Phase

The parties stipulated that on or about September 26, 1991, defendant was convicted of the second degree murder of David Raymond Dement.  The jury found true the prior-murder special-circumstance allegation.  (§ 190.2, subd. (a)(2).)

## C.  Penalty Phase

### 1.  *Prosecution evidence*

The parties stipulated to and the prosecution introduced evidence regarding the details of defendant's murder of his brother, 35-year-old David Dement.  On June 2, 1991, David and his wife were socializing at the Fresno home of Joel Parker and his girlfriend, Robin Rynes.  Late that afternoon, defendant arrived and asked to speak with David.  Parker asked defendant to leave.  Parker learned the dispute involved money defendant alleged David had taken from him, and David contended he had repaid.  Over the next five and a half to six hours, defendant returned to the Parker residence several times.  On one of these occasions, he said, "I'm going to kill my brother."  On the last occasion, David left the house and defendant shot him.  David died early the next morning as a result of a single gunshot wound.

The parties also stipulated that defendant suffered a conviction for the 1991 willful and unlawful infliction of corporeal injury on a spouse.  (§ 273.5.) Defendant committed the assault on Lisa Dement several hours before he shot his brother David.

The prosecution introduced evidence that in 1983 defendant suffered three robbery convictions, one of which had a firearm use enhancement.  (§§ 211, 12022.5.)  In 1986, he suffered a conviction for possession of a concealed weapon. (Former § 12020, Stats.1986, ch. 1421, § 1.)

10

The prosecution also introduced evidence of misconduct in jail by defendant. On November 17, 1992, and February 1, 1993, while defendant was incarcerated in the Fresno County jail, he was found to be in possession of a "shank." On September 3, 1993, after Fresno County Sheriff's Department Correctional Officer Joseph Burgen removed defendant's leg shackles and handcuffs for his recreation time, defendant punched Burgen in the face twice, and then grabbed him by the throat and pushed him backward. Another officer intervened, and after a struggle defendant was ultimately subdued.

### 2. *Defense evidence*

Numerous witnesses testified regarding defendant's childhood, his marriage to Lisa Dement, and his character. Defendant also presented expert testimony.

### *a. Background and character evidence*

Defendant was born on December 3, 1963. His sister Theresa Thacker, who was nearly five years older, testified defendant was the youngest of five children and had two older brothers, David and Larry, and two older sisters, Lorraine and Theresa. Theresa's father was Keith Thacker, and Lorraine, David, and Larry's father was Raymond Dement; neither man ever resided with the family. Defendant introduced into evidence his birth certificate, which stated Floyd Hutchins was defendant's father. Theresa testified that when defendant was five or six years old, the family home was frequented by many individuals who used drugs and alcohol, and who sometimes parked motorcycles in the living room.

George Disbrow testified that he met defendant's mother Laverne in 1971 and married her in 1972, when defendant was nine years old. He described defendant as a very congenial and attentive child who would immediately do what was asked of him. Defendant called Disbrow "Dad."

11

Disbrow smoked marijuana with Laverne and drank alcohol heavily. Between 1971 and 1974, defendant lived in about 10 different residences. At one point, Laverne was sent to jail for six months for selling barbiturates, and Disbrow cared for defendant and his older sister Theresa. Theresa testified that Disbrow would beat her about the head in defendant's presence. She sought assistance from other adults and was eventually placed in foster care. Theresa unsuccessfully tried to have defendant removed also.

At the end of 1974 or the beginning of 1975, when Laverne was released from jail, defendant, who was about 11, was living with Disbrow in Southern California. At Laverne's request, defendant returned to Fresno, and that was the last time Disbrow saw defendant.

At the time of her testimony, Theresa was an eligibility worker for the department of social services. Theresa considered herself a recovering drug addict and alcoholic. All of her siblings had experienced problems with drug and alcohol abuse, and all of her brothers had trouble with the law. Theresa described defendant as someone who cared about his family and was intelligent.

Clyde Willis, the former principal of Nelson Elementary School, knew defendant when he was in the fourth through sixth grades. Defendant was not regarded as a troublemaker. Willis recalled that in the sixth grade, defendant attended a trip to the regional learning center in the Sonora mountains; he seemed very friendly and popular with the other boys. Guy Wilson, defendant's sixth grade teacher, described defendant as a "pleasant child" who made a reasonable effort in the classroom and got along well with Wilson.

Susan Cabrera met defendant when he was about 11 and knew him at that time for a year or two. Cabrera, who was married and had a young child, was a neighbor and became acquainted with defendant's mother Laverne. Laverne's home was filthy and frequently smelled of marijuana. Laverne, who was a very

12

large woman, was physically abusive to defendant. Once, when defendant had not done a chore, she slapped him with the back of her hand so hard that he "just flew." Cabrera often heard Laverne yelling at defendant and saying, " 'Ronnie, you didn't do this, and I'm going to beat the shit out of you.' "

Defendant visited Cabrera's house daily, and Cabrera would babysit defendant when his mother had to run errands or go out of town. Laverne would tell Cabrera she was leaving defendant with her for two days to visit friends and would end up leaving him for two weeks. Cabrera and defendant developed a mother-son relationship, and his grades went from D's and F's to A's and B's. Defendant asked Cabrera and her husband to adopt him. Cabrera spoke to Laverne about doing so, but Laverne declined, saying defendant was her only means of support. After this conversation, Laverne moved from the area with defendant, and Cabrera was unable to locate them. Cabrera next saw defendant when he was 18. Defendant, who still called Cabrera "Mom," visited her with his wife, Lisa, and his daughter at Cabrera's new home in Fresno. The two resumed their relationship, and at the time of trial were close friends.

Lisa Dement, defendant's wife, testified that she met defendant in 1978 or 1979 when she was 14 and he was 15. When they had their first child in 1980, defendant was in the California Youth Authority. When he was released, he went to live with Lisa at her parents' home. They were married in 1982 and eventually had two more children. Defendant introduced into evidence photographs of the children. When defendant was not incarcerated, he worked and provided for the children, taught them to "go the right way," and was "there for them."

Lisa was with defendant when he shot his brother David. She testified she had never seen defendant so intoxicated, or act in that manner. At one point that day defendant was crying, and said he just wanted his brother to apologize to him.

13

At the time of her testimony, Lisa no longer considered herself married to defendant. Defendant wrote to and telephoned their children, and Lisa's mother took the children to visit him in jail about twice a month. Defendant was close to his children, and if he were executed, it "would hurt them a lot."

Ruth Martinez Escobedo, Lisa's mother, testified that defendant was very helpful performing chores around the house, and worked at various jobs, including at one point assisting the Escobedos with their janitorial business. Ruth described defendant as a loving, patient, and compassionate father. Both she and Solomon Escobedo, Lisa's father, testified that they regarded defendant as a son.

Lori Escobedo, Lisa Dement's sister, testified that defendant was a good influence on her 13-year-old son Joshua. Joshua and defendant often spoke on the telephone, and defendant told Joshua to listen to his mother and go to school, and that jail was "no place to end up." Cathy Olage, another of Lisa Dement's sisters, testified she had known defendant since she was nine, and he was like a brother to her. Defendant always told her to do the right thing, to go to school, to avoid drug use, and to listen to her parents. At the time of trial, Cathy was married with children, had her own home, and was a tax examiner. She had never been in any kind of trouble, and often thought about the advice defendant gave her. Defendant had expressed regret for his life of crime and drug use. Defendant's sister, Lorraine, testified that if defendant were executed, a piece of Lorraine would also die.

Michael Wilson worked with defendant at a construction site, and was later incarcerated with him. Defendant worked long hours at the construction site, was very dependable, and his lead man had "good things to say about him all the time."

Al Medina, a member of Jehovah's Witnesses, had visited defendant in jail every week for about two and a half years. The two prayed and read scripture.

14

Defendant appeared remorseful about "everything he's done in the past," and had begun to have a more positive attitude toward law enforcement officers. Joe Mora and Christopher Jackson, who had been incarcerated with defendant, testified regarding defendant's advice to other inmates to get an education and otherwise better themselves.

Tamara Scobee, who at the time of trial was incarcerated in a women's state prison for cocaine possession, testified that she had met defendant in the Fresno County jail. The two were very close, and Scobee hoped to marry defendant. Scobee described herself as a drug addict and said that defendant had assisted her in her resolve to stop using drugs. Maria Karacha testified she had known defendant for three years while he was incarcerated. Karacha had been romantically involved with defendant for nearly all of that time, but had ultimately decided they should just be friends. Defendant understood and was supportive of her decision. He sent her poetry and was "a very intelligent guy." His advice and experience had motivated her to work, stop using drugs and alcohol, and make plans to attend college in the fall.

Fresno County Sheriff's Department Correctional Officer George Lira testified he had transported defendant from court on several occasions as well as to other locations within the jail. He experienced no difficulty or security problem transporting defendant. Lira described defendant as an obviously "pretty smart guy" who enjoyed reading. His cell was very organized and clean.

### b. Expert testimony

Dr. Howard Terrell, a psychiatrist, evaluated defendant. Terrell interviewed defendant twice, in January and May 1994. He also relied on a "wealth of information" regarding defendant's childhood background drawn from interviews with family members and other individuals, which had apparently been performed

15

by an investigator. He opined that defendant suffered from an antisocial personality disorder, and that his manifestation of antisocial personality traits was quite severe. Individuals with this disorder lead lives that involve criminal behavior and violating the rules of society, and have manifested a strong pattern of improper behavior by the age of 15. As individuals with this disorder reach their 40s and 50s, the disorder tends to diminish or go into remission.

According to Dr. Terrell, defendant never met his biological father, and had no healthy father role model. The men his mother brought into the house were typically criminals and drug addicts, "people who were about the most horrible and awful role models you could . . . set before a child." When an individual is born with certain biological traits, such as an antisocial personality makeup, and then placed in an environment in which breaking the law is the norm or even encouraged, it is more likely that the person will develop an antisocial personality.

In elementary school, defendant was a good student and an exceptional athlete. He lived in an area where street gangs were prevalent, and at some point after the age of 12, defendant joined a Hispanic gang. His older brother Larry was a member of a white supremacist gang, which created conflict between defendant and his brother.

Defendant told Dr. Terrell that he had been a heavy drinker, and had used cocaine, heroin, methamphetamine, and a combination of heroin with cocaine or methamphetamine called "speedballing." He had also sniffed either gasoline or paint fumes. Defendant told Terrell he had been using methamphetamine, cocaine, heroin, and alcohol continuously for at least three days before he shot his brother. Cocaine and methamphetamine tend to make the user more paranoid and violent. Individuals who were violent while on cocaine were only so in the short term, but chronic users of methamphetamine "can be paranoid, psychiatrically violent for days, weeks, months, even up to a year after the time they use the

16

drug." Alcohol has variable effects depending on the user; some individuals become angry and engage in violent behavior. When these drugs are combined, the "potential for a disastrous outcome is even greater."

Dr. Terrell noted that all of defendant's siblings also suffered from substance abuse. Terrell would not generally expect every child in a family to have that problem, and opined that the cause was both genetics and the "horrible environment in which they were raised."

Dr. Terrell testified that when overcrowding of individuals was combined with the effects of alcohol, there was a greater propensity for violence. Terrell was familiar with the Fresno County jail, and opined that four individuals in a jail cell "would be a very unpleasant experience."

Dr. Hickey, who had appeared at the guilt phase for the defense, testified that the California State Prison, Corcoran and Pelican Bay State Prison were high security prisons. Based on defendant's record, Hickey would expect that if he received a sentence of life imprisonment without the possibility of parole, he would be sent to one of these two prisons. At Corcoran, inmates who posed a danger to other inmates were placed in the security housing unit or SHU. In the SHU, inmates were locked down 23 hours a day and had one hour a day to exercise. They enjoyed fewer privileges, such as working in a prison industry, than other inmates. They were not, however, always confined to a single cell, and were often allowed to mingle with other inmates. Some inmates were considered too dangerous to mingle, but even individuals within that group were sometimes allowed to do so on a trial basis. It is common for correctional facility inmates to possess shanks, and even within the SHU "weapons can be secured." Inmates such as defendant could eventually be transferred out of the SHU based in part on their behavior. By contrast, an individual on death row had the status of being a

17

"marked man," and in Hickey's view, received "perhaps a little better treatment" than they might have in a SHU unit.

## II. DISCUSSION

### A. Pretrial Issue: Asserted Discrimination in Exercising Peremptory Challenges

Defendant contends that the prosecutor exercised his peremptory challenges in a discriminatory manner to exclude female prospective jurors in violation of various state and federal constitutional rights. (*J.E.B. v. Alabama* (1994) 511 U.S. 127, 129; *Batson v. Kentucky* (1986) 476 U.S. 79, 89; *People v. Wheeler* (1978) 22 Cal.3d 258, 272, 276-277 (*Wheeler*).) We agree with the trial court that defendant made no prima facie showing that these prospective jurors were challenged because of their gender.

#### 1. *Factual Background*

After the prosecutor exercised his 13th peremptory challenge, defendant made a *Wheeler* motion. By agreement, argument on the motion was reserved until after the jury was sworn. The jury as sworn was comprised of six men and six women.

At the hearing on the *Wheeler* motion, defense counsel asserted that the prosecutor's exercise of challenges against six women "in a row," and exercising 10 of his 13 peremptory challenges against women when women constituted about half of the jury panel, demonstrated a prima facie case that the prosecutor "has exercised his challenges disproportionately against women which are [a] cognizable subgroup." Defense counsel also opined that "[w]omen as a whole on this jury panel have shown that they . . . would be more merciful, less adamant in imposing the death penalty, possibly more compassionate and more likely to entertain life without possibility of parole as an option." She argued that was the reason the prosecutor excused these women and that such an excusal would

18

constitute impermissible group bias. The prosecutor responded that women "are as fairly represented" on the jury "as they possibly can be." The court found no prima facie showing of impermissible discriminatory use of peremptory challenges.

### 2. *Analysis*

The use of peremptory challenges to exclude prospective jurors based on gender violates both the federal and state Constitutions. (*J.E.B. v. Alabama*, *supra*, 511 U.S. at p. 129; *People v. Bonilla* (2007) 41 Cal.4th 313, 341 (*Bonilla*).) "There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." (*Bonilla*, at p. 341.) To do so, the following procedures apply: "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the [gender] exclusion' by offering permissible [gender]-neutral justifications for the strikes. [Citations.] Third, '[i]f a [gender]-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful [gender] discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.) "When, as in this case, it is unclear whether the trial court used the recently disapproved 'strong likelihood' standard, rather than the correct 'reasonable inference' standard, 'we review the record independently to determine whether the record supports an inference that the prosecutor excused a juror on a prohibited discriminatory basis.' " (*People v. Davis* (2009) 46 Cal.4th 539, 582-583.)

We conclude that the totality of relevant facts here is inconsistent with an inference of discriminatory purpose. The circumstance that the prosecutor

19

exercised 10 of his 13 peremptory challenges against women is not dispositive. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1291, 1295 [prosecutor exercised 20 out of 23 peremptory challenges against female prospective jurors; no prima facie case demonstrated]; *Bonilla*, *supra*, 41 Cal.4th at pp. 345, 349 [prosecutor used 20 out of 30 peremptories against female prospective jurors; no prima facie case demonstrated].) The prosecutor used only 13 of his 20 available peremptories.[4]

Moreover, the Attorney General asserts and defendant does not dispute that the prosecutor knew which prospective juror would replace a prospective juror excused by a peremptory challenge. Yet *nine* of the 13 peremptory challenges exercised by the prosecutor resulted in women being seated in the jury panel. Although the prosecutor also excused some of those women, our examination of the sequence of the prosecution's peremptory challenges reveals no discernible pattern of discrimination towards female prospective jurors.

Given that 20 of the 40 prospective jurors subject to peremptory challenge were female, it cannot be said the prosecutor struck most or all of the women from the venire. (*People v. Taylor* (2010) 48 Cal.4th 574, 615 (*Taylor*).) In addition, the jury as sworn included six women. (*People v. Snow* (1987) 44 Cal.3d 216, 225 [although the circumstance that the prosecutor accepted a panel containing members of the cognizable group is not conclusive, it is "an indication of the prosecutor's good faith in exercising his peremptories"].)

---

[4] The prosecutor excused a female prospective juror, accepted the panel, excused three female prospective jurors, accepted the panel four times, excused two female prospective jurors, excused a male prospective juror, excused two female prospective jurors, excused a male prospective juror, excused a female prospective juror, excused a male prospective juror, and excused a female prospective juror. The defense made its *Wheeler* motion, and the prosecutor once more accepted the panel before both sides did so.

We also note that neither defendant nor the murder victim was female. Although this circumstance does not affirmatively demonstrate the absence of discrimination, it "identifies a factor that, because it is absent, fails in this case to support an inference of discrimination." (*People v. Bell* (2007) 40 Cal.4th 582, 600 (*Bell*).)

Defendant notes that the prosecutor asked Prospective Jurors K.M. and A.H. no questions, and asked few of Prospective Jurors L.M., K.S., M.S., and P.T., before exercising peremptory challenges against them.[5] Although relevant (*Taylor*, *supra*, 48 Cal.4th at p. 615), this circumstance is of little importance here given the information otherwise available to the prosecutor regarding the prospective jurors. In addition to individual questioning, the prospective jurors in the jury box received instruction by the court and were asked questions as a group by the parties that did not require a response unless a prospective juror had a question or comment about that area. Even without an audible reply, the prosecutor could observe the prospective jurors' demeanor as each instruction was given or question was asked. In addition, the prosecutor could observe the voir dire of these prospective jurors by the court and defense counsel.

Moreover, before voir dire, the prosecutor had reviewed the 21-page questionnaire containing 87 questions with subparts filled out by each prospective juror. (*Taylor*, *supra*, 48 Cal.4th at pp. 615-616 [that the prospective juror had completed a 98-question questionnaire was notable when the prosecutor failed to ask any questions]; *Bell*, *supra*, 40 Cal.4th at pp. 598-599, fn. 5 [noting the trial

_____

[5] Although trial occurred at a time when voir dire was primarily performed by the trial court, the court in this case allowed the parties to question the jurors. (See Code Civ. Proc., former § 223, added by Prop. 115, adopted by the voters June 5, 1990, Primary Election.)

court's comment that " 'when you have a questionnaire, it can never be a perfunctory examination' "].)  Indeed, the prosecutor at one point told the prospective jurors:  "I don't want you folks to think that I don't care about the case because I'm going through these quickly.  It's just that there really is quite an adequate amount of information in your questionnaire.  They're so chock full of information that we don't normally get when we're asking and looking at a jury.  We have to ask all the questions.  But this is actually kind of easier for us because everything is in writing, [and] we've had time to look it over."  "A party is not required to examine a prospective juror about every aspect that might cause concern before it may exercise a peremptory challenge." (*People v. Jones* (2011) 51 Cal.4th 346, 363.)  Under these circumstances, we place little weight on the prosecutor's failure to individually or more thoroughly question a prospective juror before exercising a peremptory challenge.

Defendant asserts that in determining whether he established a prima facie case of purposeful discrimination, this court should engage in comparative juror analysis for the first time on appeal.  We have concluded such analysis is neither mandated nor helpful in a first-stage case.  "Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his strikes are pretextual, it has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales, and we thus decline to engage in a comparative analysis here." (*Bonilla*, *supra*, 41 Cal.4th at p. 350.)

## B. Guilt Phase Issues

### 1. *Admission of extrajudicial statements*

Defendant contends that the trial court erred by admitting the prior inconsistent statements of Eric Johnson and Albert Martinez.[6] We disagree.

### a. *Factual background*

On direct examination in the prosecution's case-in-chief, Johnson testified that on April 9, 1992, the morning the victim's body was discovered, he was interviewed by a law enforcement officer. Johnson testified he did not know defendant, and either did not recall or denied having made certain statements during that interview. On cross-examination, Johnson said he knew of no one else who had the same name as he did, and that he had suffered three prior felony convictions. Defense counsel did not inquire regarding his prior statement to law enforcement. Fresno County Sheriff's Department Detective Sherman Lee subsequently testified regarding Johnson's April 9 statement. (See *ante*, at p. 3.) Counsel stipulated that the "Eric Johnson" who had made the statement was the same person who testified at trial. Defendant does not refer us to, and we have not found, an objection to introduction of the prior statement, although defendant did

---

[6] With respect to this and other claims on appeal, defendant argues that the asserted error violated various of his constitutional rights. In some instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. Unless otherwise indicated, either (1) the appellate claim is of a kind that required no trial court action by defendant to preserve it, or (2) the constitutional claims do not invoke facts or legal standards different from those defendant asked the trial court to apply but merely assert that the alleged errors were also constitutional violations. To that extent, the new constitutional arguments are not forfeited on appeal. Rejection, on the merits, of a claim that the trial court erred on the issue actually before that court also means a rejection of the new constitutional "gloss." In such cases, we generally provide no separate constitutional discussion. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

move to strike one sentence of Johnson's statement as testified to by Lee, and objected at times during Lee's testimony on the grounds of hearsay, relevance, lack of foundation, calling for a narrative, and speculation. Hence it appears the trial court made no express ruling regarding admission of that statement.

On direct examination, Martinez denied knowing defendant or being able to recognize his voice. He did not recall or denied having made several observations or hearing certain statements during the night of April 8 to 9, the night the victim was killed. On cross-examination, Martinez testified that he was interviewed by a law enforcement officer on April 9, the morning the victim's body was discovered, but did not recall being interviewed again on April 13, the date of his prior statement. Martinez also said that before his testimony at trial, the prosecution had shown him an April 13 statement. Martinez started to read it, but "didn't remember saying any of that." When asked if "anyone in law enforcement tried to get you to say things about what happened that night that didn't happen that night," Martinez responded, "No." Martinez also testified on cross-examination that he had been arrested once or twice for giving false information to police officers, had suffered three prior felony convictions, agreed with defense counsel that it was "fair to say that sometimes you tell law enforcement officers the truth and sometimes you don't," and stated that half of what inmates said in jail or prison regarding what they had done or were going to do was exaggeration.

Outside the presence of the jury, defense counsel questioned Detective Christian, who had participated in the April 13 interview, regarding whether the Martinez who was interviewed on that date was the same person who testified at trial. After Christian identified Martinez as the individual he had interviewed, defense counsel saw no "reason to voir dire this witness," and stated they did not "have any evidence . . . to dispute that this is the same person." The trial court ruled that Martinez's "lack of memory [was] feigned and contrived," and

24

overruled defendant's confrontation clause objection to admission of the April 13 statement. Christian subsequently testified regarding Martinez's prior statement. (See *ante*, at pp. 5-6.)

The court instructed the jury: "Evidence that on some former occasion a witness made a statement or statements that were inconsistent or consistent with the testimony in this trial may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on such former occasion. If you disbelieve a witness'[s] testimony that he or she no longer remembers a certain event, such testimony is inconsistent with a prior statement or statements made by him or her describing that event."

### b. *Analysis*

Defendant did not object to admission of Johnson's prior statement, no exception to the general requirement of an objection is applicable, and thus defendant has forfeited on appeal his claim that admission of the statement violated his right to confrontation of witnesses. (See *People v. Williams* (1976) 16 Cal.3d 663, 667, fn. 4 ["It is the general rule, of course, that questions relating to the admissibility of evidence will not be reviewed on appeal absent a specific and timely objection at trial on the ground sought to be urged on appeal"].)

The claim also lacks merit. Both Johnson's and Martinez's prior statements were properly admitted because both of these individuals testified. There was no dispute at trial that the individuals interviewed in the two statements were the same Johnson and Martinez who testified at trial. When a declarant "appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. [Citation.] It is therefore irrelevant that the reliability of some out-of-court statements ' "cannot be replicated . . . ." '

[Citation.]  The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."  (*Crawford v. Washington* (2004) 541 U.S. 36, 60, fn. 9 (*Crawford*); see *California v. Green* (1970) 399 U.S. 149, 161 ["[N]one of our decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial"].)  The testimony by Johnson and Martinez at trial gave the jury the opportunity to assess their demeanor as they denied making or asserted lack of recollection regarding their prior statements.  (*People v. Martinez* (2005) 125 Cal.App.4th 1035, 1050; see *California v. Green*, at p. 160.)  Defendant "received what the confrontation clause requires: a full opportunity to confront and cross-examine" Johnson and Martinez.  (*People v. Stevens* (2007) 41 Cal.4th 182, 199 (*Stevens*).

Relying on *Douglas v. Alabama* (1965) 380 U.S. 415, 420, defendant contends that " 'effective confrontation of [Johnson and Martinez] was possible only if [these witnesses] affirmed the statement[s]' " as their own.  Because Johnson and Martinez did not affirm the statements, defendant contends they could not "defend or explain" them as that language is used in *Crawford*. (*Crawford*, *supra*, 541 U.S. at p. 60, fn. 9.)

The high court later characterized as dictum the language in *Douglas v. Alabama* on which defendant relies, and noted that "[o]f course, a witness *can* be cross-examined concerning a statement not 'affirmed' by him . . . ."  (*Nelson v. O'Neil* (1971) 402 U.S. 622, 627.)  Moreover, unlike the witness in *Douglas v. Alabama*, Johnson and Martinez did not invoke their Fifth Amendment privilege against self-incrimination and refuse to answer any questions about the crime, a circumstance that would have rendered them "totally unavailable at the trial for any kind of cross-examination."  (*Nelson v. O'Neil*, at p. 628; see *Douglas v. Alabama*, *supra*, 380 U.S. at p. 416.)  Finally, the phrase "defend or explain" in

26

footnote 9 of *Crawford* does not mean that when a witness denies making, or claims lack of recollection of, a particular statement, admission of the statement violates a defendant's right to confrontation. (*Crawford*, *supra*, 541 U.S. at p. 60, fn. 9.) This is made clear by the first sentence of the same paragraph of the footnote, which broadly states that when a declarant "appears for cross-examination at trial, the confrontation clause places no constraints at all on the use of his prior testimonial statements." (*Ibid.*) Nothing in *Crawford* casts doubt on earlier cases holding that the confrontation clause is not violated by the introduction of out-of-court statements a witness denies or does not recall making. (*Nelson v. O'Neil*, at pp. 629-630 [a defendant is "denied no rights protected by the Sixth and Fourteenth Amendments" when a "codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts"]; *United States v. Owens* (1988) 484 U.S. 554, 555-556, 559 [the confrontation clause does not bar "testimony concerning a prior, out-of-court identification when the identifying witness is unable, because of memory loss, to explain the basis for the identification"].)

### 2. *Asserted* **Edwards** *violation*

Defendant contends that the trial court erred in admitting statements he made to Detective Christian at the hospital after he had invoked his right to counsel. We disagree.

#### a. *Factual background*

Detective Christian testified outside the jury's presence and, without objection, read into the record a written report regarding his hospital conversation with defendant. On April 9, 1992 at about 12:15 p.m., Christian attempted to interview defendant about Greg Andrews's murder. After being advised of his

*Miranda* rights, defendant invoked his right to counsel. (*Miranda v. Arizona* (1966) 384 U.S. 436, 479.) The interview was immediately terminated. Detective Christian and Detective Burke then transported defendant to Valley Medical Center for treatment of injuries to his right hand and foot. Defendant expressed concern he might have broken a bone in his foot, and his hand was "substantially swollen" and appeared possibly broken. Christian was also interested in obtaining an X-ray of defendant's hand to investigate whether the hand could have been a weapon in the homicide.

Detective Christian and defendant waited at the hospital for some time, probably around "two hours, maybe less," before defendant received medical treatment. Christian had previously been involved in a homicide investigation in which the defendant was Thomas Rutledge. Rutledge had been arrested in South Lake Tahoe with defendant's wife, "Patricia" Dement.[7] At some point, to "make conversation," Christian mentioned to defendant that he had recently interviewed his wife regarding a February 1992 homicide. Christian also told defendant that his wife had been "picked up" with Rutledge, and that Rutledge was in custody for the homicide. Defendant responded that he knew that, and that he was going to take care of Rutledge for getting his wife involved in that incident. Christian asked defendant if he knew Rutledge. Defendant said he did, that he and Rutledge were enemies, and that Rutledge had disrespected him. Defendant also said that he knew Rutledge was under investigation for murder, and had heard a rumor that Rutledge was involved in the murder. Defendant then stated that if law enforcement were to get Rutledge into jail with defendant, they would not have to

---

[7] Although defendant's wife testified that her name was Lisa Dement, Detective Christian testified at the in limine hearing that he "knew her as Patricia."

28

worry about "the murders anymore" (according to Christian's report) or "taking him to court" (according to Christian's in limine testimony).

Defendant then asked Christian what the name of the subject was. Christian asked defendant who he was referring to, and defendant said, " 'You know, the guy that went to sleep.' " Christian said, "Greg Andrews." Defendant nodded his head, and said, " 'He was a friend of Tom's.' " Defendant "would say no more regarding the incident."

Detective Christian further testified that the names "Tom Rutledge" and "Patricia Dement" had not previously arisen in the investigation of Greg Andrews's death. At the time Christian was speaking with defendant at the hospital, Christian had no information that would link Tom Rutledge to Greg Andrews. Christian had "no intent whatsoever to ask him any questions related to this incident or draw any statements from him that would be incriminatory" because Christian understood such statements would not be admissible.

The trial court ruled that no interrogation had occurred. Christian subsequently testified before the jury regarding the conversation with defendant. (See *ante*, at p. 7.)

### b. Analysis

If a suspect receives *Miranda* warnings, and thereafter requests counsel, the interrogation generally must cease until an attorney is present. (*Edwards v. Arizona* (1981) 451 U.S. 477, 482; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033; see *Maryland v. Shatzer* (2010) __ U.S. __, __ [130 S.Ct 1213, 1222-1225, 1227] [a break in custody, which includes a return to the general prison population, of at least 14 days ends the *Edwards* presumption of involuntariness].) " '[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know

29

are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fns. omitted.) "Clearly, not all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response." (*People v. Clark* (1993) 5 Cal.4th 950, 985 (*Clark*).) We also keep in mind "the purpose behind [the] decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." (*Arizona v. Mauro* (1987) 481 U.S 520, 529-530.) If the defendant, after invoking his right to counsel, initiates a statement to police, "nothing in the Fifth and Fourteenth Amendments . . . prohibit[s] the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." (*Edwards v. Arizona*, at p. 485.)

Here, Detective Christian's statement telling defendant that he had interviewed defendant's wife regarding an apparently unrelated February 1992 homicide, and asking whether defendant knew Tom Rutledge, did not constitute interrogation. Given the circumstances that neither the name of defendant's wife nor that of Tom Rutledge had arisen in the investigation of Greg Andrews's murder, and Christian had no information that would link Tom Rutledge to Andrews, we cannot say that Christian should have known that defendant "would suddenly be moved to make a self-incriminating response." (*Rhode Island v. Innis, supra*, 446 U.S. at p. 303; see *id*. at pp. 294-295, 303 [declining to conclude officers should have known that their brief conversation with one another in the suspect's presence expressing concern that children in the area might discover a missing shotgun and hurt themselves was reasonably likely to elicit an

30

incriminating response]; *People v. Huggins* (2006) 38 Cal.4th 175, 198 [telling the defendant "he was a murder suspect did not call on him to confess"]; *Clark*, *supra*, 5 Cal.4th at p. 985 [there was no reason for the officer to "have known that his casual estimate of possible penalties would produce an incriminating response from this defendant"].)

Although defendant's question regarding the name of the person who "went to sleep" concerned Andrews's homicide, and not an unrelated homicide, Detective Christian's response — merely telling defendant the victim's name — was also not the type of statement Christian should have known was likely to elicit an incriminating response. Unlike in *People v. Sims* (1993) 5 Cal.4th 405, 442, on which defendant relies, Christian's response to defendant's inquiry did not "pursue[] a line of conversation far exceeding the scope of any" legitimately responsive answer.

Defendant asserts that Christian's initiation of a conversation regarding defendant's wife "and her involvement with another man and a murder investigation" was "likely to induce an emotional response, e.g., anger, sadness, [or] humiliation." Christian testified that he did not "know what the relationship" between Patricia Dement and Rutledge was. Moreover, officers do not have to avoid all remarks that might make a suspect upset or angry, but only those that are "reasonably likely to elicit an incriminating response." (*Rhode Island v. Innis*, *supra*, 446 U.S. at p. 301.) Nor, contrary to defendant's further assertion, does the circumstance that while waiting for defendant's medical treatment Detectives Christian and Burke teased defendant about his F-14 tattoo by referring to defendant as a fighter pilot demonstrate that the atmosphere was "essentially hostile, and intended to provoke an ill-considered incriminatory response which could be used in prosecuting" defendant.

31

Defendant notes that in Detective Christian's report, after defendant made the comment that the murder victim Andrews was a friend of Rutledge's, the detective commented that defendant "would say no more regarding the incident." Defendant argues this language suggests that Christian "attempted to get [defendant] to say more." However, even if Christian had interrogated defendant after his statement connecting Andrews and Rutledge, that interrogation produced no statements; hence defendant could not have been prejudiced by any such interrogation.

### 3. *Admission of written statements by defendant*

Defendant contends that the trial court erred by admitting evidence of defendant's written statements, or kites, because they were surreptitiously obtained by a government agent, they contained irrelevant information, their probative value was substantially outweighed by their prejudicial nature, and they amounted to inadmissible criminal propensity evidence. (*Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*).) We disagree.

#### a. *Factual background*

During trial a hearing was held outside the presence of the jury on the *Massiah* claim. Fresno County jail inmate Trinidad Ybarra, who received from defendant the kites introduced at trial, Detective Christian, and Michael Castro testified.

##### 1) *Ybarra's testimony*

Ybarra testified that in about 1991, when he was imprisoned in the Corcoran Security Housing Unit (SHU), he volunteered to begin a debriefing process to leave his gang, the Nuestra Raza. He gave prison officials a written statement relaying everything he knew about the gang, and a copy of the gang constitution. Ybarra also met with a gang coordinator, who told Ybarra to relay everything he

32

knew about the gang. Ybarra understood he was to share this information as long as he lived. The gang coordinator also told Ybarra he wanted him to infiltrate prison gangs and work undercover to "prove to him I wanted out." Ybarra was unable to infiltrate because one of the gang members "pulled [his] cover." Once his cover was "blown," Ybarra was not asked if he would still try to obtain as much information as he could about some gang members. Ybarra wrote to the gang coordinator explaining his cover was gone, and he could not infiltrate, but he never received a response.

In about February 1991, Ybarra was released on parole in Fresno County. Ybarra spoke to his parole officer about the debriefing process. Ybarra did not ask for a shorter parole, or for leniency if he violated his parole, because "they're not going to give you something special just because you're going to debrief." Ybarra simply wanted "to get out of the gang."

In January 1993 Ybarra was incarcerated in the Fresno County jail on a drug-related charge. Ybarra's cell was near defendant's cell. Ybarra could tell defendant was either a Nuestra Raza member or a "sympathizer" with that gang. Ybarra started obtaining names of gang members from defendant for debriefing. After Ybarra learned defendant was in jail on a murder charge, Ybarra "got the idea of he's giving me all these names, maybe I can work him on confessing, and I knew that if I could get that, I pretty much knew that I'd get a deal from the D.A." Ybarra said that "[a]nybody knows that . . . if you know about a murder, . . . of course [law enforcement is] going to want to know about it." No one told Ybarra they wanted him to report any statements defendant made about Greg Andrews's murder: "No one ever told me to do anything." Ybarra acted on his own.

Ybarra wrote a note to law enforcement saying he could obtain information on the murderer of Greg Andrews. Detective Christian met with him. Before Ybarra met with Christian he had already received kites from defendant, including

33

the second kite admitted at trial.  Ybarra thought, but was not positive, that he received the first kite admitted at trial after he met with Christian.  Christian did not tell Ybarra to collect kites from defendant.  Christian told Ybarra he could not tell him to do something like that, and that if he did obtain information, the best Ybarra could do was turn them in, and law enforcement would show them to the district attorney, and Ybarra could possibly work out a deal.  Christian did not promise Ybarra anything specific, or tell him he would work with the district attorney to try to do something for Ybarra.  Christian told Ybarra he could not guarantee anything, that all Christian could do was turn over the kites to the district attorney and then the district attorney would contact Christian.

After meeting with Detective Christian, Ybarra continued writing to defendant.  Ybarra was trying in a "roundabout way for him to confess to me on paper that he did the murder" of Greg Andrews.  He wanted it "on paper because homeboy pretty much bragged about it anyways."  Ybarra was hoping he "could get a deal so I could get out."  Ybarra "believe[d] that [defendant] never actually confessed to me in any letter."

After Ybarra had collected more kites, he contacted Detective Christian.  Ybarra met with Christian a second time, and gave him the kites.  Christian said that all he could do at that stage was turn the kites over to the district attorney, and "there was no guarantee he was going to get back at me."

Ybarra was released from jail after he signed the contract for his testimony.  Ybarra never debriefed, and was still a member of the Nuestra Raza gang at the time of trial.

### 2)  Detective Christian's testimony

Detective Christian testified that on or about April 1, 1993, Ybarra sent a note to jail staff requesting to be interviewed "regarding this matter."  As a result,

34

Christian interviewed Ybarra for about 10 minutes. Ybarra said he and defendant were writing to each other nearly every day, and he had letters from defendant to give Christian. Ybarra had no letters with him, but asked if anything could be done regarding his current charges if he could produce the letters for Christian. Christian told Ybarra that was up to his attorney and the district attorney's office; Christian "could make him no promises." Christian advised Ybarra to retain anything he received from defendant, but did not tell him to write letters to defendant. Christian informed Ybarra that he could not ask defendant anything "specific to this case" because defendant had invoked his right to counsel. Christian also told Ybarra that "he was not to elicit information from him on our behalf, that he was not to discuss the case with him and then bring me those letters, that I didn't want those." Ybarra said that he wanted to speak with his attorney regarding a deal before he gave Christian the letters, and Christian asked Ybarra to have his attorney contact him.[8] Christian spoke to Ybarra's attorney, Bill Fernside, on the telephone about a week after his meeting with Ybarra, and requested he be present when Ybarra turned over the kites because Ybarra wanted him there. Christian also spoke with the prosecutor in defendant's case, who said that any deal for Ybarra's testimony would depend on what information Ybarra possessed, and apparently also on what charges Ybarra was facing.

On April 21, 1993, Ybarra and Fernside met with Detective Christian, and gave him the kites. At the meeting, Christian told Fernside that he was interested in having the prosecution enter into a deal with Ybarra for the kites, but Fernside

_____

[8] Also at the first meeting, Ybarra told Detective Christian that he had debriefed with the Department of Corrections. At either the first or second meeting between Ybarra and Christian, Christian asked Ybarra if he had ever done anything other than debrief Department of Correction investigators, and Ybarra stated he had "never worked for law enforcement."

35

"would have to work [any deal] out with the District Attorney's Office themselves. I was in no position to tell him what could be offered."

Detective Christian testified that Ybarra had described specific statements in some of the letters and "[t]here is one for sure that . . . he told me that he had in his possession prior to our first meeting." Defense counsel asked, "[W]hich one is this?" and as Christian started to answer, said, "Your Honor, let me say, I'm asking this not for the truth of the matter asserted, but to show this witness's frame of mind relative to good faith bad faith and a *Massiah* motion, because he obviously can't know the truthfulness of the . . . ." The trial court interjected, "You're asking this not be received for its truth?" Defense counsel replied, "That's correct." The court asked the prosecutor if he objected, and the prosecutor said, "No." Christian then identified the first kite admitted at trial containing the language "[d]ude was my brother."

### 3) *Testimony of Michael Castro*

Michael Castro testified that he was an assistant unit supervisor with the Fresno adult parole unit, a division of the Department of Corrections, and the gang institutional coordinator for the parole units in Fresno. "Debriefing" is a "process for gang members who wish to disassociate themselves from a prison gang or street gang," in which they meet with an institution coordinator, or parole officer if they are not in custody, and orally "give information about their past experiences and membership in the gang." The interviewer then asks the inmate or parolee to write a history of or document his gang involvement. The interviewer reviews the document to see if the information is adequate, and in some cases administers a polygraph exam. After completing a series of reviews, the person can be considered "unaffiliated and dropped from the gang." If, however, the information is inadequate, the Department of Corrections maintains "gang status on that

36

person." An individual who passes debriefing and then commits another offense and is sent to prison will likely be placed in "protective custody status." Debriefing is not a lifelong process.

Castro met with Ybarra apparently sometime before January 1993 when he was on parole. Ybarra provided Castro with a copy of a written history he said he had submitted to an institutional investigator before being paroled. Much of the information was old, and when Castro asked Ybarra about individuals who might be involved in gang activity in the Fresno area, he was evasive. Castro did not feel Ybarra was "being totally honest" with him concerning current information. Castro did not tell Ybarra to get any additional information. Rather, he advised Ybarra that if he went back into custody with the Department of Corrections he should contact an institutional investigator and tell him he wanted to provide specific and additional information regarding his gang activity. Castro also told him, "You seem to be doing very well. If you keep doing well, debriefing will never be an issue for you because you won't go back to prison." Although Castro subsequently saw Ybarra in the parole office, they did not converse, and Castro had no other contact with him.

### 4) Ruling on the motion and evidence and instruction at trial

The prosecutor conceded Ybarra had interrogated defendant, but contended he was not a government agent. The trial court found no *Massiah* violation. Following this ruling, the prosecutor limited the evidence he sought to introduce to statements in two kites, and the court heard argument on defendant's Evidence Code section 352 and relevance objections.[9]

---

[9] The first kite introduced at trial read:

*(footnote continued on next page)*

Defense counsel asserted that the prejudice of referring to the brother's murder outweighed its probative value of adding meaning and clarity to the defendant's statement. She proposed that the first kite introduced simply read: "On this other trip, hey, shit happens Homme, the shit ain't over but I'll say this, Dude had it coming. I feel no different, it don't bother me. I'm looking at the chair but I don't think they will get me this time anyway." Defense counsel also asserted that the availability of Ybarra's testimony that defendant boasted about killing Andrews, and that Ybarra tried to get defendant to confess to this murder in writing, undercut the prosecution's need for the reference to the brother's murder in the kites.

The trial court admitted the written statements. It ruled: "One of four men could have performed this killing," and "those who have testified . . . . have been impeached from wall to wall on a variety of subjects. They could also be found to

---

*(footnote continued from previous page)*

"I'm doing 29 to life for the 1st one, Dude was my brother but was on the other side of the fence. On this other trip, hey shit happens Homme. The shit ain't over but I'll say this, Dude had it coming, both of them. I feel no different, it don't bother me. I'm looking at the chair but I don't think they will get me on this trip anyway."

The second kite introduced at trial read:

"The vato [dude] here was a gava [white]. On my carnales [brother][,] he was a runner. See I'm a half breed myself so there's more to that story than the paper says, tu sabes [do you understand]. Mikio pulled me down for his trial, that why I was here. Ain't no thing brother before its over I'll tag a few more, got to keep these fools in check at times."

The parties stipulated that "kite" means "jailhouse letter," "vato" means "dude," "carnales" means "brother," "gava" means "white," and "tu sabes" means "do you understand?"

be co-participants. . . . . That gives the chief relevance to the statement attributed to [defendant]. It is highly relevant [and] . . . . very prejudicial. . . . [The] first letter . . . should be admitted in its entirety. I tried to read this without the reference to the brother, and it doesn't make sense. It doesn't show that they were talking about a killing when they were talking about trips and tags. If it does, that point is for the jury to decide whether you have varying interpretations." The court also admitted the second letter, ultimately removing at the parties' stipulation a reference to the brother being an "AB" runner, which the prosecutor contended was a reference to the Aryan Brotherhood.

Ybarra did not testify at trial. Rather, a stipulation regarding the circumstances surrounding the kites, including their language and identifying defendant as the author, was read to the jury. A portion of Ybarra's redacted April 1994 "Contract for Testimony" was also read to the jury. Immediately after the reading of these two documents, the court admonished the jury: "Ladies and gentlemen, evidence has been introduced which includes a reference showing that the Defendant committed a crime other than that for which he is on trial. Such evidence, if believed, was not received and may not be considered by you to prove that the Defendant is a person of bad character or that he has a disposition to commit crimes. The evidence was received and may be considered by you only for the limited purpose of providing context and meaning to the written statement made by the Defendant. The Defendant in a criminal action has the right to expect that his guilt or innocence will be decided by the evidence brought before the jury and without regard to any alleged prior conduct. Therefore, you must only consider this evidence for the limited purpose for which it was introduced."

The court reminded the jury of this limiting instruction before the close of evidence. In addition, the admonishment was repeated during the court's instructions to the jury at the end of the guilt phase.[10]  During closing argument, the prosecutor asserted the kites were a confession to murdering Andrews, but urged the jury to follow the cautionary instruction, and stated that it would be a "misuse to conclude" language about a prior killing "means the [d]efendant has a predisposition."

### b.  Analysis

Under *Massiah* when, after adversarial judicial criminal proceedings have been initiated and in the unwaived absence of counsel, a government agent deliberately elicits from a defendant incriminating statements, those statements are inadmissible at a trial on the charges to which the statements pertain.  (*Fellers v. United States* (2004) 540 U.S. 519, 523; *Maine v. Moulton* (1985) 474 U.S. 159, 170, 180; *Massiah*, *supra*, 377 U.S. at p. 206.)  Such a Sixth Amendment violation occurs when the government intentionally creates or knowingly exploits a situation likely to induce the defendant to make incriminating statements without the assistance of counsel, but not when the government obtains such statements through happenstance or luck.  (*Maine v. Moulton*, at p. 176; *United States v. Henry* (1980) 447 U.S. 264, 274 (*Henry*).)  " 'Specifically, the evidence must establish that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the

---

**10**  At the end of the guilt phase, the court also instructed the jury:  "Certain evidence was admitted for a limited purpose.  At the time this evidence was admitted you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted.  Do not consider such evidence for any purpose except for the limited purpose for which it was admitted."

expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 67 (*Coffman and Marlow*).)

Here, the trial court properly determined that Ybarra was not a government agent at the time he received the kites from defendant. Unlike the informant in *Henry*, on which defendant relies, Ybarra had no preexisting position as an informant. (*Henry*, *supra*, 447 U.S. at p. 266.) Contrary to defendant's assertion, Ybarra did not become an agent for purposes of *Massiah* simply because he began a debriefing process with Corcoran prison authorities to end his gang affiliation two years before he met defendant. Rather, we have held that a "general policy of encouraging inmates to provide useful information does not transform them into government agents." (*People v. Williams* (1988) 44 Cal.3d 1127, 1141 [that the "sheriff's department followed the practice of accepting information provided by inmates, and, when feasible, of rewarding inmates for providing that information," and inmates were "probably aware of that policy," was insufficient to demonstrate the informant was a government agent].)

Nor, contrary to defendant's assertion, did Detective Christian give "his imprimatur to Ybarra's scheme . . . in the hope that Ybarra would obtain incriminating information or statements by" defendant. Indeed, as a preliminary matter, it appears both kites admitted at trial were received by Ybarra *before* his first meeting with Detective Christian on or about April 1. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1234, 1248 (*Fairbank*) [no U.S. Const., Sixth Amend. violation with respect to notes and information the defendant gave a fellow inmate before the inmate first contacted the police].) Ybarra testified that he had received the second kite before ever meeting with Christian. In addition, Christian testified that Ybarra described certain kites he had in his possession before his first meeting with Christian, including the first kite containing the language "[d]ude was my

41

brother." Although this statement was not admitted for its truth, apparently because Christian had no means of knowing whether Ybarra actually possessed such a letter, it is evidence that Ybarra described a kite containing this language at his first meeting with Christian. The circumstance that such a letter was ultimately produced at the second meeting indicates that Ybarra most likely had the letter before his first meeting with Christian.

Even assuming the first kite was received after Ybarra's first meeting with Detective Christian, nothing in Christian's statements to Ybarra demonstrates that Christian intentionally created or knowingly exploited a situation likely to induce defendant to make incriminating statements without the assistance of counsel. (*Maine v. Moulton*, *supra*, 474 U.S. at p. 176; *Henry*, *supra*, 447 U.S. at p. 274.) Defendant relies on Christian's statement that Ybarra should retain anything he received from defendant. Such passive behavior on the part of Ybarra was unlikely to induce defendant to make incriminating statements. More critically, Christian did not tell Ybarra to write to defendant, and "specifically told him that he was not to elicit information from [defendant] on our behalf, that he was not to discuss the case with him and then bring me those letters, that I didn't want those." He also told Ybarra he could not ask defendant anything "specific to this case" because defendant had invoked his right to counsel. Ybarra testified that no one told him to report statements defendant made about Greg Andrews's murder; "[n]o one ever told me to do anything."

Moreover, Ybarra was promised no benefit if he produced the kites. Rather, Detective Christian told Ybarra he "could make him no promises," and did not tell him he would work with the district attorney on Ybarra's behalf. Christian told Ybarra he could not guarantee anything, that all he could do was turn over the kites to the district attorney and then the district attorney would contact Christian. "The requirement of agency is not satisfied when law enforcement officials

42

'merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement, or guidance.' " (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 67; see *id*. at p. 66 [the defendant failed to demonstrate that "the government did anything more than accept information that [an inmate] elicited from [the defendant] on her own initiative"]; see *People v. Hartsch* (2010) 49 Cal.4th 472, 490, 492 (*Hartsch*) [inmate who was not prompted by police to obtain statements from defendant, given no instructions or advance notice regarding a meeting with defendant, and not told the meeting would be taped, was not a police agent]; *Fairbank*, *supra*, 16 Cal.4th at p. 1248 [although police believed inmate "would continue to try to obtain information from [the] defendant," and a deputy district attorney prevented defendant's move away from inmate, no implicit agreement between police and inmate was demonstrated when police made no promises to inmate about a possible deal, "did not direct him to obtain more information," and "did not suggest that obtaining more information would benefit him"]; see also *Fairbank v. Ayers* (9th Cir. 2011) 650 F.3d 1243, 1255-1256 [even if an informant subjectively believed that the officer's statement was a request to ask the defendant for information, "this does not constitute the requisite state involvement" to make the informant a government agent].) No *Massiah* violation appears.

We turn now to defendant's other objections. Although defendant cites Evidence Code section 1101, the evidence of defendant's prior commission of murder was not introduced as prior criminal behavior, but merely to give context and meaning to defendant's admission to killing Andrews. Hence, the analysis is

properly one under Evidence Code section 352.[11]  Under section 352, a trial court

may "exclude otherwise relevant evidence when its probative value is substantially

outweighed by concerns of undue prejudice, confusion, or consumption of time."

(*People v. Riggs* (2008) 44 Cal.4th 248, 290.)  " 'Evidence is substantially more

prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk

to the fairness of the proceedings or the reliability of the outcome." ' " (*Ibid*.)  We

conclude no such intolerable risk was present here.

Contrary to defendant's assertion, the kites, which were stipulated to have

been written by defendant, were relevant and probative as an admission to

Andrews's murder.  Although the prosecution also presented the eyewitness

testimony of Benjamin and Bond, the trial court observed that these witnesses had

been impeached from "wall to wall."  Moreover, the probative value of this

evidence decreased significantly if the first kite was redacted in the manner

suggested by defense counsel because the redaction removed portions of the kite

that indicated defendant was admitting responsibility for Andrews's murder.

Nor did admission of the kites create a substantial danger of undue prejudice.

Although the kites could be understood to include defendant's assertion he had

killed someone he referred to as a brother (a word he also used when referring to

Ybarra), they also included a reference to the circumstance that defendant was

serving a sentence of 29 years to life for that crime.  The fact that any prior murder

by defendant had resulted in a criminal conviction and a substantial prison term

decreased the potential for prejudice because "the jury was not tempted to convict

---

[11]  Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

defendant of the charged offenses, regardless of his guilt, in order to assure that he would be punished for" any prior murder. (*People v. Balcolm* (1994) 7 Cal.4th 414, 427.) The court instructed the jury that the reference to defendant's alleged earlier crime could only be considered to give context and meaning to defendant's written statement, and could not be used as evidence of defendant's criminal disposition or in deciding whether he was guilty of the current charges. We presume the jury followed that instruction. (*People v. Avila* (2006) 38 Cal.4th 491, 574.)

In light of these factors, the trial court acted within its discretion in finding the probative value of defendant's statements was not substantially outweighed by the probability that their admission would create a substantial danger of undue prejudice.

Even if the trial court had erred in admitting the reference to defendant's asserted prior murder, there is no reasonable probability he was prejudiced. As noted, the court repeatedly instructed the jury as to the limited purpose for which it could consider the reference to defendant's alleged prior conduct. Moreover, defendant proceeded primarily on the theory that Benjamin or Bond had committed the murder, and the jury was informed that Benjamin had a prior murder conviction. In addition, the evidence of guilt was overwhelming, and included defendant's displeasure at a fourth person being placed in the cell, his awareness that Andrews was friends with Rutledge, who was an enemy of defendant's, defendant's statements before the attack on Andrews that defendant was going to "do his ass" and "take care of the home boy that had just been put into his tank," the detailed testimony of defendant's cellmates regarding defendant's attack on Andrews, defendant's statements to other inmates later that morning that he had killed someone and describing the attack, defendant's solicitation of help from other inmates to remove Andrews's body from the cell,

and physical injuries to Andrews and defendant that were consistent with Benjamin's and Bond's testimony. (See *People v. Bonin* (1988) 46 Cal.3d 659, 680, 690 [any misconduct by the prosecutor in eliciting testimony that the defendant had admitted to committing 14 killings in addition to the four murders for which he was on trial and the two murders introduced to establish identity was not prejudicial because the evidence of guilt was overwhelming].)

Defendant asserts that the prosecution erroneously relied on the kites during argument at the penalty phase. Evidence that defendant was convicted of murdering his brother was properly admitted at the penalty phase, and hence this reference by the prosecutor was appropriate. (§ 190.3, factors (b), (c); *People v. Bacon* (2010) 50 Cal.4th 1082, 1122.)

### 4. *Denial of motion for mistrial*

Defendant contends that the trial court erred in denying his motion for mistrial made when inmate Bradley Nelson testified that defendant had boasted about killing his brother. We disagree.

#### a. Factual background

On June 23, 1994, prior to Nelson's testimony, and out of the presence of the jury, the court admonished Nelson: "Do not volunteer or answer a question that would relate any of your knowledge about [defendant] being involved in a prior murder. . . . [¶] . . . [¶] . . . Don't tell us anything about it." On direct examination that same day, Nelson described various events surrounding Andrews's murder, including Nelson's discovery of Andrews's body in defendant's cell and defendant's subsequent visit to Nelson's cell. While discussing defendant's visit to Nelson's cell, the prosecutor asked, "[A]t any point did [defendant] threaten you?" Nelson responded, "He told me. . . because he knew Greg was my friend, if I said anything, he'd deal with it." The prosecutor subsequently asked, "[D]uring

46

this course of events where you felt you were being threatened, . . . was [defendant] doing anything physically?"  Nelson responded, "Well, he was kind of jumping around a little bit and stuff, and, you know, he was — he told me that — you know, he'd bragged before about killing his brother and stuff[12] — oop — and anyway he said that . . . it didn't mean anything for him to take a human life."  The prosecutor asked, "He told you that?"  Nelson said, "Yes."  After a few more questions had been asked, defendant moved for a mistrial outside the presence of the jury.  The court took the motion under advisement, and asked defense counsel if they wanted the court to admonish the jury.  Defense counsel said they did not want a "curative instruction read at the present time" because of concern it might emphasize Nelson's testimony.  Defendant subsequently filed a written motion for mistrial.

On July 12, 1994, the trial court denied the motion, and invited counsel to submit a proposed curative instruction.  On July 13, after the defense had completed presentation of its evidence, the trial court struck Nelson's statement.  It gave an instruction that the parties agreed upon, and additionally told the jury at length to disregard the statement.

"Ladies and gentlemen, we were shocked several days ago almost into losing our wits about us when a witness, Brad Nelson, violated a very direct admonition that I had given him, and you may recall at the time he said, 'Whoops,' and we recessed shortly after that.

---

[12]  Defense counsel subsequently observed, and the court and the prosecutor did not disagree, that after making this statement, Nelson "hit his hand to his face and said, 'Oop,' in that universal gesture of 'I have committed a boo-boo.' "

47

"You may recall that during the course of his testimony he indicated that he had heard, we don't know from whom, perhaps — well, we don't know for sure from the testimony, that he heard that [defendant] was bragging about killing his brother. That was his testimony. It was nonresponsive to any question, and I am now admonishing you to disregard it and treat it as though you never heard of it. I very specifically cautioned him that we wanted [defendant] to get a very fair trial in this case.

"I've given you a cautionary instruction already to indicate — to make sense of some of these kites that you've heard; that if it does make sense to you, that you may consider for a limited purpose that reference of the killing of the brother, true or false; it doesn't make any difference, but it gives meaning to the statement. But Mr. Nelson inadvertently, I think, but who knows, relayed something that you should not be considering in this part of the trial, and that is not something, true or false, for you to speculate on.

"Your issue is going to be has the evidence proved [defendant] guilty of any crime based on what you've heard? Not on what he may have done before or why he may have been in jail. That's not a concern of yours at this point. So . . . we talked about it, here's the cautionary instruction that I'm going to give you that . . . I've asked the attorneys to help me with . . . .

"The witness, Brad Nelson, testified that the defendant had bragged about committing a crime other than the crime for which defendant is on trial in the current case. Mr. Nelson's testimony on a separate crime is hereby stricken, . . . and you're admonished to disregard such testimony. Do not allow Mr. Nelson's testimony on that uncharged, alleged crime to enter into deliberations.

[Defendant's] guilt or innocence must be determined without regard to any alleged prior conduct. [**13**]

"I think you can appreciate the sense of that. When we say it is . . . inappropriate for you to believe that what you hear, something either outside of the trial or something that may have gone on before, and to then conclude, well, if he's a bad guy, then he must have been committing the instant offense, that not a basis for your decision. You look at the evidence that's been presented on that subject. And that's where you're limited.

". . . I don't know how I can make this any clearer, and I have the confidence that you're going to do your duty, whatever it may be, based on the evidence you do have."**14**

### b. Analysis

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions . . . .' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v.*

---

[**13**] Defense counsel informed the court that "[t]he prosecution and the defense have agreed" that this paragraph is "an appropriate instruction."

**14** At the close of the guilt phase, the court likewise instructed the jury: "Do not consider for any purpose . . . any evidence that was stricken by the Court; treat it as though you had never heard of it. [¶] . . . [¶] . . . [T]he witness Brad Nelson testified that the defendant had bragged about committing a crime other than the crime for which defendant is on trial in the current case. Mr. Nelson's testimony on a separate crime is hereby stricken and you are hereby instructed to disregard such testimony. Do not allow Mr. Nelson's testimony on an uncharged alleged crime to enter into your deliberations. Mr. Dement's guilt or innocence must be determined without regard to any alleged prior conduct."

*Collins* (2010) 49 Cal.4th 175, 198.) "Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice." (*People v. Wharton* (1991) 53 Cal.3d 522, 565.) We conclude here that Nelson's comment was not "so incurably prejudicial that a new trial was required." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.)

Nelson's comment that defendant had bragged about killing his brother was brief and isolated. Moreover, it was largely duplicative of evidence the jury properly received. The jury could reasonably find that defendant's statements in his kites to Ybarra indicated that defendant had previously killed someone he referred to as his brother, and felt justified in doing so. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1029 [the witness's overheard comment as she left the witness stand that defendant was a " 'dog, ' " " 'mad dog, ' " or " 'dirty black dog' " was not prejudicial in part because the jury already knew that the witness scorned the defendant because "she saw him gun down her daughter in church"].) In addition, the trial court struck Nelson's statement, and repeatedly admonished the jury to disregard it and to determine defendant's guilt for Andrews's murder without reference to any of defendant's alleged prior conduct.

Defendant contends that the "time lag between Nelson's improper testimony and the instruction striking the testimony compounded the substantial prejudice arising from that testimony." Defense counsel, however, expressly declined to request an admonition at the time Nelson made the comment, and defendant points to no defense request for an instruction before the court gave its lengthy

admonition.[15]  In sum, the trial court did not abuse its broad discretion in denying the mistrial motion.

### 5. *Challenge to oral copulation conviction and special circumstance finding*

Defendant contends the evidence was insufficient to support his conviction for oral copulation (§ 288a, subd. (e)) or the jury's finding of first degree felony murder, or to sustain the true finding on the murder while engaged in the attempted commission of oral copulation special-circumstance allegation. (§ 190.2, subd. (a)(17).)  In particular, he contends that mere contact between a mouth and a penis does not constitute oral copulation.  He further contends that the jury instructions "unconstitutionally lightened the burden of the prosecution, misstated the elements of the offense, effectively eliminated any jury determination of an element of the offense, and allowed a verdict of guilt based upon acts not prohibited by section 288a."  We disagree.

Section 288a, subdivision (a) (section 288a(a)) provides, and in 1992 provided, that "[o]ral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person."  Subdivision (e) provides that "[a]ny person who participates in an act of oral copulation while confined in any state prison . . . or in any local detention facility . . . shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year."[16]  The court instructed the jury that "[a]ny contact, however slight,

_____

[15]  June 23, 1994, the day Nelson testified, was the 16th day of trial.  July 12, the day the mistrial motion was denied, was the 21st day of trial, and the jury received a curative instruction the following day.

[16]  Section 288a, subdivision (e) does not appear to require that the act of oral copulation be accomplished against the victim's will by means of force or fear.  (See Witkin & Epstein, 2 Cal. Criminal Law (3d ed. 2000) § 31, p. 341 ["Except for state or local prisoners, prohibitions against oral copulation do not

*(footnote continued on next page)*

between the mouth of one person and the sexual organ of another person constitutes oral copulation. Penetration of the mouth or sexual organ is not required. Proof of ejaculation is not required."**17** We conclude that this

---

*(footnote continued from previous page)*

apply to consenting adults"]; see § 286, subd. (e) [similar provision for sodomy].) But murder committed in the perpetration of or attempted perpetration of all proscribed oral copulation, including oral copulation under section 288a, subdivision (e), is first degree murder under the felony-murder rule. (§ 189.) Application of the felony-murder rule to subdivision (e) is theoretically troubling because the rule would apply even when the only participants in the oral copulation act are consenting adults. Although "the power to define crimes lies exclusively with the Legislature" (*People v. Farley* (2009) 46 Cal.4th 1053, 1119 (*Farley*)), and not this court, it is not clear why, in the abstract, section 288a, subdivision (e) should constitute a serious and inherently dangerous felony warranting invocation of the felony murder rule. (See *People v. Cavitt* (2004) 33 Cal.4th 187, 197 ["only those felonies that are inherently dangerous to life or pose a significant prospect of violence are enumerated" in § 189]; *People v. Rios* (2000) 23 Cal.4th 450, 460, fn. 6 ["Under the felony-murder rule, a homicide is murder when it occurs in the course of certain serious and inherently dangerous felonies"].) Defendant does not, however, challenge his conviction on this basis. Moreover, there is substantial evidence that the oral copulation in this case was forcible. Finally, the jury expressly found defendant guilty of first degree murder on two theories: premeditated murder and felony murder. Thus, whatever theoretical problems that may exist due to the circumstance that oral copulation proscribed by section 288a, subdivision (e) does not appear to require force or fear do not apply here.

**17** The complete jury instruction provided: "Defendant is accused in Count Two of the Information of having committed the crime of unlawful oral copulation by a prisoner, violation of Section 288a(e) of the Penal Code. Any person, while confined in any local detention facility, who engages in any act of oral copulation with another person is guilty of the crime of unlawful oral copulation in violation of 288a(e) of the Penal Code.

"In order to prove such crime, each of the following elements must be proved[:] 1. A person engaged in an act of oral copulation with another person; and, 2. At the time of the act, such person was confined in a local detention facility.

*(footnote continued on next page)*

instruction correctly states the substantive requirement of contact in the crime of oral copulation.[18]

Although we have previously never expressly decided that any contact, however slight, between the mouth of one person and the sexual organ or anus of another person constitutes oral copulation within the meaning of section 288a(a), we have quoted with approval a CALJIC jury instruction so providing. (*People v. Panah* (2005) 35 Cal.4th 395, 489.) We have also described section 288a(a) as "involv[ing] contact between 'the mouth of one person [and] the sexual organ or anus of another person.' " (*People v. Martinez* (1995) 11 Cal.4th 434, 443, fn. 6 (*Martinez*).) In addition, we have observed that the language of section 288a(a) suggests that "a prolonged encounter is not necessary to convict under the scheme," and differentiated oral copulation from crimes requiring penetration. (*People v. Scott* (1994) 9 Cal.4th 331, 341.) Indeed, nothing in the language of section 288a(a) indicates that more than slight contact is required. The majority of Court of Appeal cases agree.[19]

---

*(footnote continued from previous page)*

"Oral copulation is the act of copulating the mouth of one person with the sexual organ of another person. Any contact, however slight, between the mouth of one person and the sexual organ of another person constitutes oral copulation. Penetration of the mouth or sexual organ is not required. Proof of ejaculation is not required."

[18] CALCRIM No. 1022 (2011) is similar: "Oral copulation is any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person. Penetration is not required." (Italics omitted.)

[19] *People v. Hesslink* (1985) 167 Cal.App.3d 781, 790-791 (the victim's testimony that the defendant "pushed her head toward his penis and that she orally copulated him . . . clearly supports a finding that her mouth did touch defendant's penis"); *People v. Carter* (1983) 144 Cal.App.3d 534, 539 (oral copulation does not require penetration of the mouth by the penis, but is committed "when the victim's mouth is forcibly placed upon the genital organ of another"); *People v.*

*(footnote continued on next page)*

Defendant relies on *People v. Angier* (1941) 44 Cal.App.2d 417, 419, which held that "mere contact of the mouth with the sexual organ of another, either by a 'kissing' or a 'licking,' cannot be construed to mean a copulation." However, *Angier* "was repudiated by its author" in *Harris*, *supra*, 108 Cal.App.2d at page 88, and "has become a 'derelict on the seas of jurisprudence.' It is often discussed but never followed. It is simply not the law." (*Wilson*, *supra*, 20 Cal.App.3d at p. 510; see *People v. Cline* (1969) 2 Cal.App.3d 989, 992-993, fn. 2 [noting in dicta that the "view [in *Angier*] was repudiated by the author of that opinion, and reframed as follows: 'A person is guilty of violating the statute when he has placed his mouth upon the genital organ of another' "].)

Other older cases have observed that "[a]ny penetration of the mouth, no matter how slight, constitutes a violation" of section 288a. (*People v. Hickok* (1950) 96 Cal.App.2d 621, 628; see *People v. Chamberlain* (1952) 114

---

*(footnote continued from previous page)*

*Minor* (1980) 104 Cal.App.3d 194, 196-197 (the offense of forcible oral copulation "is complete" when "the mouth is forcibly placed upon the genital organ of another"); *People v. Wilson* (1971) 20 Cal.App.3d 507, 510 (*Wilson*) (sufficient evidence of oral copulation when victims testified that the defendant "kissed them in the vaginal area with his tongue"); *People v. Hunter* (1958) 158 Cal.App.2d 500, 502, 505 (evidence that the victim licked the perpetrator between his legs, and he performed a similar act on her, was legally sufficient to demonstrate a violation of § 288a); *People v. Bennett* (1953) 119 Cal.App.2d 224, 227 (a violation of § 288a does not require penetration); *People v. Harris* (1951) 108 Cal.App.2d 84, 88 (*Harris*) ("A person is guilty of violating [§ 288a] when he has placed his mouth upon the genital organ of another"); see *People v. Catelli* (1991) 227 Cal.App.3d 1434, 1450-1451, fn. 7 (*Catelli*) (observing in dicta that the "early construction of 'copulation' to exclude the 'mere kiss or lick of the private organ, even though lewdly done' " has been repudiated); *People v. Massey* (1955) 137 Cal.App.2d 623, 624-625 (relying on *Harris*, *supra*, 108 Cal.App.2d 84, to say that word "copulating" has a well-understood meaning).

Cal.App.2d 192, 194 [same].) We discern no penetration requirement in the language of the statute, a requirement the Legislature clearly knows how to designate.[20] (*Martinez*, *supra*, 11 Cal.4th at p. 443 [sex crime statutes such as §§ 288a, 261, 286, and 289 "describe[] the criminal act in precise and clinical terms," and make "eminently clear" when "penetration of a specific body part or cavity is required"]; cf. §§ 263 ["[a]ny sexual penetration, however slight, is sufficient to complete the crime" of rape], 286, subd. (a) ["[a]ny sexual penetration, however slight, is sufficient to complete the crime of sodomy"].)[21]

Moreover, the gravamen of the offense of oral copulation "is the revulsion and harm suffered by one who is forced to unwillingly touch his or her mouth to the genitals of another." (*Catelli*, *supra*, 227 Cal.App.3d at p. 1450.) Although defendant correctly notes that section 288a, subdivision (e) appears to apply to adult inmate consensual conduct, and hence would not always involve revulsion, there is no indication that the Legislature intended to apply a different definition of oral copulation to subdivision (e) than it did to the remainder of the statute.

In sum, the evidence was sufficient to support defendant's oral copulation conviction and the jury's finding of first degree felony murder. To the extent defendant challenges the sufficiency of the evidence to support the attempted-oral-copulation special circumstance on this basis, that argument also fails. (Defendant

---

[20] *People v. Angier*, *supra*, 44 Cal.App.2d 417, *People v. Hickok*, *supra*, 96 Cal.App.2d 621, and *People v. Chamberlain*, *supra*, 114 Cal.App.2d 192, are disapproved to the extent they are inconsistent with this opinion.

[21] The legislative history supports this interpretation of section 288a(a). In 1982, section 288a(a) was amended to add the words "or anus" to the definition of oral copulation. In discussing this amendment, one analysis noted that the bill "would expand the definition of oral copulation to include oral contact with the anus of another person." (Sen. Republican Caucus, analysis of Assem. Bill No. 2721 (1981-1982 Reg. Sess.) as amended Aug. 3, 1982, p. 2.) Such language does not obviously denote substantial contact or penetration.

also challenges the sufficiency of the evidence of the special circumstance on another basis, discussed *post*, pt. II.B.6.b.)

### 6. Further challenge to the oral copulation special-circumstance finding

#### a. Alleged instructional error regarding special circumstance

Defendant contends that the trial court erred in responding to a jury inquiry in violation of section 1138 and various constitutional rights.[22] We disagree.

The court instructed the jury in the language of CALJIC No. 8.81.17 (5th ed. 1988): "To find that the special circumstance[] referred to in these instructions as murder in the commission of the crime of unlawful oral copulation by a prisoner . . . is true, it must be proved: 1. That the murder was committed while the [d]efendant was engaged in the commission or attempted commission of an unlawful oral copulation by a prisoner . . . ; and, 2. The murder was committed in order to carry out or advance the commission of the crime of unlawful oral copulation by a prisoner . . . , or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance[] referred to in these instructions [is] not established if the unlawful oral copulation by a prisoner . . . was merely incidental to the commission of the murder."

During deliberations, the jury sent this note to the court: "Can you explain advancing the crime of oral copulation in the special circumstance portion of first degree murder? Does oral sex . . . have to be the primary objective or can it be

---

[22] Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

56

part of the crime? Or is the continuous sequence of the crime enough to warrant [a] special circumstance[]?"

After consulting with the attorneys, the court instructed the jury to "read the words of these instructions in their ordinary and usual sense," that there was no requirement that oral sex be the primary objective, that a continuous sequence of the crime was not enough to warrant the special circumstance, and that the oral sex could not be merely incidental to the murder. The court then reread the original instructions, and stated that whether the oral copulation was merely incidental to the commission of the murder was for the jury to decide based on the circumstances of the case.

After conferring with counsel again, the trial court further instructed: "[T]here are two numbered paragraphs. . . . That means two separate requirements, both of which must exist before you find special circumstances. If you have a reasonable doubt as to whether either one of them exists, of course that means the People have not met their burden of proof."

The foreperson asked for further explanation of what "advanc[ing]" the crime of oral copulation in the special circumstance meant. The court responded, "in its most plain and ordinary meaning, that would mean furthering that crime or facilitating that crime, advancing the crime." Defense counsel suggested, and the court agreed, that "enable," "further facilitate," and "make more likely" were synonyms for "advancing." After the jury returned to deliberations, the court invited counsel to submit any further suggested special circumstance instructions the following morning.

The following morning, no further instructions were submitted by either side. Rather, the prosecutor offered to move to strike the attempted-oral-copulation special circumstance if the jury had already reached a unanimous verdict on the murder count, and if so, unanimously agreed as to the degree of murder. The

57

prosecutor said he was uncomfortable with the instructions regarding the special circumstance, and expressed the view that the second paragraph of CALJIC No. 8.81.17 did not correctly state the law. Defense counsel ultimately rejected this offer out of concern they would be faulted for allowing the jury's deliberative process to be interrupted. Counsel expressed the view that the law in the area of special circumstances was complex and "doesn't really make sense in this area," but "it's what we have." The court recessed to allow the parties to consider the matter further. No further discussion of this issue appears on the record. The jury returned its verdict the next day.

Defendant contends that the supplemental instructions "failed to clarify any meaningful standards," "further confused the issue and misled the jury," "distorted the jury's understanding of the applicable law," and "deflected the jury from consideration of relevant circumstances from which a finding that the special circumstance was not true could be found." Contrary to defendant's assertion, the trial court did not err by instructing the jury that it need not find oral copulation was defendant's "primary" objective. (*People v. Bolden* (2002) 29 Cal.4th 515, 558 (*Bolden*).) Nor did the trial court "effectively [tell] the jury that it was up to them to determine what the instructions meant in this case," or dissuade it from seeking further clarification. Although defendant suggests additional supplemental instructions that might have been given, the instructions given were adequate, and defense counsel had ample opportunity to suggest additional clarifying instructions below and failed to do so. (*People v. Russell* (2010) 50 Cal.4th 1228, 1273.)

> b. *Sufficiency of the evidence to support the special circumstance*

Defendant contends that the evidence was insufficient to establish that the murder was committed to advance or carry out the commission of oral copulation,

and hence cannot sustain the jury's finding on the attempted-oral-copulation special circumstance allegation. He also challenges the trial court's denial of his motion for judgment of acquittal on the special circumstance allegation.[23] (§ 1118.1.) Defendant further asserts that the evidence relevant to the special circumstance does not rationally distinguish him from other murderers sufficient to justify subjecting him to the death penalty.

" 'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made." (*Stevens*, *supra*, 41 Cal.4th at p. 200.)

Generally, to prove a felony-murder special circumstance like murder in the commission of attempted oral copulation, " 'the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended

---

[23] The trial court impliedly denied the motion for judgment of acquittal when it instructed the jury in the language of the special circumstance allegation.

murder.' "[24] (*Bolden*, *supra*, 29 Cal.4th at p. 554.) " 'Concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance.' [Citation.] It is only when the underlying felony is merely incidental to the murder that the felony-murder special circumstance does not apply." (*Ibid*.) Contrary to defendant's assertion, "there is no requirement that the prosecution prove an additional or different element that the killing be committed to 'advance' " or carry out the felony. (*People v. Dykes* (2009) 46 Cal.4th 731, 760-761 (*Dykes*).)[25] Indeed, because the evidence here does not support an

[24] A statutory exception, not relevant here, exists when the underlying felony is kidnapping in violation of sections 207, 209, or 209.5, or arson in violation of section 451, subdivision (b). To prove these special circumstances "if there is specific intent to kill, it is only required that there be proof of the elements of those felonies. If so established, those two special circumstances are proven even if the felony of kidnapping or arson is committed primarily or solely for the purpose of facilitating the murder." (§ 190.2, subd. (a)(17)(M).)

[25] The second paragraph of CALJIC No. 8.81.17 contains other circumstances in addition to advancing or carrying out the commission of a felony, i.e., "to facilitate the escape therefrom or to avoid detection." We have stated that *People v. Green* (1980) 27 Cal.3d 1, 59-62, simply requires that the felony not be merely incidental to the commission of murder, and that CALJIC No. 8.81.17 provides examples of circumstances under which a felony is not merely incidental to the murder. (See *Dykes*, *supra*, 46 Cal.4th at p. 761, fn. 5 ["The 'carry out or advance' language found in the pattern instruction is based upon our cases and constitutes merely another way of describing the *Green* rule—that a felony murder is not established by proof of a felony that was merely incidental to a murder"]; *People v. Horning* (2004) 34 Cal.4th 871, 907-908 [*Green* only requires that the felony not be merely incidental to the commission of the murder, and CALJIC No. 8.81.17 provides explanations of this requirement].)

Nonetheless, the instruction would be clearer and provide more guidance if it expressly described these scenarios as examples, and stated that a felony is not incidental to the commission of murder when the defendant has an independent purpose for the commission of the felony. Such an instruction would provide something along the lines of: "The special circumstance referred to in these instructions is not established if [the felony] was merely incidental to the

*(footnote continued on next page)*

inference that defendant might have intended to murder Andrews without having an independent intent to commit oral copulation, there was no duty to even instruct in the language of CALJIC No. 8.81.17's second paragraph which includes the language "carry out or advance the commission" of the felony. (*People v. Monterroso* (2004) 34 Cal.4th 743, 767.)

We conclude substantial evidence exists — and existed at the close of the prosecution's case-in-chief — to demonstrate defendant killed Andrews while engaged in the attempted commission of oral copulation. The prosecution's evidence showed defendant's displeasure at a fourth person being placed in the cell, and his awareness that Andrews was friends with Rutledge, who had "disrespected" defendant and was an enemy of his. Defendant brutally beat Andrews and ripped off his boxer shorts. He then exposed his penis and ordered Andrews to kiss it. After Andrews did so, defendant said "I ought to fuck him," and asked Bond and Benjamin if they wanted to fuck Andrews "or get their dicks sucked." Defendant continued beating Andrews, and ultimately strangled him to death. Following the attack, Martinez heard defendant say "he was trying to go up in the guy," which Martinez said meant "trying to fuck him."

---

*(footnote continued from previous page)*

commission of the murder. [The felony] is merely incidental to the murder when there is no purpose for the commission of the felony that is independent of the murder. [A felony] is not merely incidental to the commission of murder when, for example, the murder was committed in order to carry out or advance the commission of [the felony] or to facilitate the escape therefrom or to avoid detection. A felony is also not merely incidental to the commission of murder when the defendant has an independent purpose for the commission of [the felony]. Simultaneous intents to kill and to commit an independent felony will support a felony-murder special circumstance."

61

This constitutes substantial evidence that defendant had either a sexual interest in Andrews or a desire to humiliate him. Thus, defendant's commission of oral copulation was not merely incidental to the murder. (See *People v. Abilez* (2007) 41 Cal.4th 472, 511-512 [jury could reasonably have inferred from the evidence that defendant wished to injure and humiliate his mother by sodomizing her before killing her in retaliation for her mistreatment of him; hence the sodomy was not incidental to the murder].) Contrary to defendant's assertion, "a jury deciding the truth of the special circumstance allegation is not required to assign a hierarchy to the defendant's motives in order to determine which of multiple concurrent intents was 'primary,' but instead the jury need only determine whether commission of the underlying felony was or was not merely incidental to the murder." (*Bolden*, *supra*, 29 Cal.4th at p. 558.) For these same reasons, we reject defendant's further contention that the evidence relevant to the special circumstance finding, which he describes as "fleeting contact," does not rationally distinguish him from other murderers sufficient to justify subjecting him to the death penalty.

Defendant asserts that the court did not instruct the jury that the special circumstance allegation could be found true based on concurrent and independent intents to kill and to commit oral copulation, and hence the finding cannot be upheld on this basis. The instructions that the court gave adequately explained the requirement for the special circumstance that the attempted oral copulation not be merely incidental to the murder. (See *Bolden*, *supra*, 29 Cal.4th at p. 558.)

### 7. *Asserted prosecutorial misconduct*

Defendant contends the prosecutor committed prejudicial misconduct during closing argument. We disagree.

During his rebuttal argument, the prosecutor said: "I'd like to go through some of the testimony — some of the statements that were made by the defense attorneys in this case. I'd like you to recall something with respect to the Bond and Benjamin conspiracy. Remember, right here in these United States, there's a Fifth Amendment right. You don't have to be interviewed by a police officer. You don't have to testify. At any time, anywhere along from the first morning, neither Bond nor Benjamin didn't have to say a thing, but they did. I want you to bear that in mind." Defense counsel objected, and asked for a conference. The trial court suggested it reserve ruling, and the prosecutor's argument continue, and defense counsel agreed.

Later in his argument, the prosecutor said without objection: "Both men basically came and said, 'What I'm telling you here today after I've thought about it, I've read my statements, I've been cross-examined, I've given you my best effort.' That was the final statement from these men." The prosecutor also said without objection: "And you could convict this man based on simply the testimony of Benjamin and Bond. And when you look at their testimony, I submit to you that most of what they told you was the truth. They pretty much at this point in time had to. You could ignore that testimony completely. Say they didn't come forward. Say they decided to sit here and take the Fifth, and we provided to you the testimony instead of Anthony Williams, Brad Nelson, Albert Martinez, Eric Johnson."

After the prosecutor's argument, defense counsel moved for a mistrial on the ground of prosecutorial misconduct, asserting that Bond had in fact asserted his Fifth Amendment right at the preliminary hearing in this case, and the reference to "neither Mr. Benjamin nor Mr. Bond invoking their Fifth Amendment rights was to further spotlight the fact that our client has availed himself of [his] Fifth Amendment rights." The trial court denied the mistrial motion.

Defendant did not object below to later portions of the prosecutor's argument, no exception to the general requirement of an objection is applicable, and the claim is therefore forfeited. (*People v. Schmeck* (2005) 37 Cal.4th 240, 286.) Moreover, his claim as to all portions of the argument is meritless.

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711 (*Avila*).) Here, defendant contends that the prosecutor's statement during closing argument that Bonds and Benjamin did not have to say anything "anywhere along from the first morning" was a "reference to matters outside the evidentiary record before the jury." There is no reasonable likelihood the jury would so understand the prosecutor's statement. (*People v. Friend* (2009) 47 Cal.4th 1, 29 (*Friend*) [observing that reasonable likelihood is the applicable standard].) Rather, it would assume the prosecutor was referring to evidence before the jury, which consisted of the testimony of Bond and Benjamin at trial, and impeachment and rehabilitation of these witnesses by their prior statements to police and testimony at other proceedings.

Defendant also contends the prosecutor misstated the record. He relies on Bond's response when asked on cross-examination if he remembered testifying at the preliminary hearing. Bond said, "I think I pled the Fifth then." Defense counsel, however, then read a portion of Bond's testimony at the preliminary hearing, during which he did not invoke the Fifth Amendment. It is not apparent how this portion of the transcript demonstrates that the prosecutor's rebuttal argument was false. In any event, in the challenged comments the prosecutor did not argue that Bond and Benjamin had never asserted their Fifth Amendment

64

rights; he merely asserted that these individuals had given statements to police and had testified.

Defendant contends that the trial court erroneously failed to take judicial notice of the preliminary hearing transcript in this case. Even assuming judicial notice was appropriate, defendant does not delineate what information was contained in the transcript that would have supported his claim of prosecutorial misconduct.

Nor did the prosecutor's argument constitute impermissible comment on the defendant's failure to testify. (*Griffin v. California* (1965) 380 U.S. 609, 613, 615.) The challenged comments made no reference to defendant, let alone suggested the jury could treat " 'defendant's silence as substantive evidence of guilt.' " (*United States v. Robinson* (1988) 485 U.S. 25, 32.)

Even assuming there is a reasonable likelihood the jury understood the prosecutor's remarks as a comment on defendant's failure to testify, no prejudice is possible under any standard. The court instructed the jury: "A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact that a defendant does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way. In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him. No lack of testimony on defendant's part will make up for failure of proof by the People so as to support a finding against him on any such essential element." We presume the jury followed these instructions. (*People v. Verdugo* (2010) 50 Cal.4th 263, 302.)

## 8. *Restriction on cross-examination*

Defendant contends that the trial court improperly restricted his cross-examination of his cellmate, Benjamin. We disagree.

On direct examination, the prosecution established that Benjamin had been convicted of murder in 1974. During cross-examination, outside the presence of the jury, defense counsel stated that Benjamin had a history of blackouts, and "has always attributed his homicide to such a blackout." Counsel also asserted that Benjamin took the stand during his murder trial and "offered testimony that some other dude did it, and once he got to [prison], he accepts full responsibility and says, 'I did it.' And I would be offering that for purposes of impeachment." Counsel noted, apparently relying on prison interviews, that Benjamin "keeps saying things like, 'Benjamin does not seek to suggest that the blackout diminished his responsibility for the . . . shooting. He remembers the shooting but does attribute his poor judgment and inaccurate aim to his intoxication at the time.' " Counsel intended to demonstrate that Benjamin "20 years back in another homicide pointed the finger of responsibility toward another party . . . . [¶] . . . much as what he's doing now."

The trial court stated that it was not interested in delving into Benjamin's case. It sustained the prosecutor's objection, ruling: "There may be no reference to what occurred in that other case with respect to this witness denying it, blaming it on another dude and then later admitting that he was the one that did it. That is strictly collateral."

"[I]mpeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*People v. Wheeler* (1992) 4 Cal.4th 284,

66

296-297.)  Here, it is not apparent, as defendant assumes, that Benjamin's testimony in his murder trial was false, as opposed to his later statements to prison personnel.  (See *People v. DeSantis* (1992) 2 Cal.4th 1198, 1226-1227 [assertion that witness had committed perjury when he said he was lying during a different proceeding not supported by the record and hence of minimal probative value].)  In addition, presentation of this evidence would have required a significant time-consuming detour into the circumstances two decades earlier under which each statement was made.  Moreover, the jury was well aware that Benjamin was in the cell with defendant during the murder, and had every motivation to shift blame away from himself.  The trial court acted well within its discretion under Evidence Code section 352 in precluding exploration of this collateral matter.  (*People v. Gurule* (2002) 28 Cal.4th 557, 619 [the trial court did not abuse its discretion by excluding evidence that a witness had in other crimes admitted some blame but shifted the bulk of the responsibility to others, as it was time-consuming hearsay and character evidence that was not particularly probative].)

Contrary to defendant's claim, the asserted error did not violate his rights to confront witnesses or to present a defense.  Defendant fails to demonstrate, as he must to prevail on his confrontation claim, that the "cross-examination would have produced 'a significantly different impression of [the witness's] credibility.' " (*People v. Frye* (1998) 18 Cal.4th 894, 946.)  Benjamin was impeached throughout his testimony by inconsistencies between his trial testimony and his earlier statements to police, to a defense investigator, and at a civil deposition; his prior felony convictions for murder, drunk driving, sexual assault, bank robbery, and a narcotics-related offense; the circumstance that he was 45 years old at the time of trial, and the longest period of time he had spent not incarcerated since he was 12 years old was 14 to 16 months; his history of suffering from alcohol-related blackouts; his willingness to give information to law enforcement in the

67

past in exchange for a benefit to himself, and the possibility he would benefit from his testimony in defendant's case in his sentencing for his current conviction. Indeed, defendant's cross-examination of Benjamin consumes about 155 pages of the record.

Moreover, "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834.) Here, defendant was given considerable leeway to challenge Benjamin's veracity and suggest his motivation to lie. Defendant was not precluded from attempting to demonstrate that Benjamin was not worthy of belief; he was merely precluded from proving it with time-consuming and remote evidence that was not obviously probative on the question. (See *Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327; *People v. Jones* (1998) 17 Cal.4th 279, 305.)

**9.** *Asserted instructional error*

*a. Consciousness of guilt instruction*

Defendant contends the trial court prejudicially erred in instructing the jury in the language of CALJIC No. 2.06 (attempt to suppress evidence).[26] We have repeatedly rejected claims similar to defendant's that this instruction improperly duplicates the circumstantial evidence instructions, is partisan and argumentative, permits the jury to irrationally infer guilt, or undermines the reasonable doubt requirement. (*Friend*, *supra*, 47 Cal.4th at pp. 52-53; *People v. Zambrano* (2007)

---

[26] The court instructed: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by the intimidation of a witness or by destroying evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

41 Cal.4th 1082, 1159 (*Zambrano*); *People v. Jackson* (1996) 13 Cal.4th 1164, 1224 (*Jackson*).)  Defendant offers no persuasive reason for us to reconsider these conclusions.[27]

Defendant also contends that the instruction allowed an inference of consciousness of guilt only as to defendant when all three remaining cellmates took part in cleaning up the cell and disposing of evidence, and thus was improperly argumentative and partisan.  We disagree.  The instruction merely informed the jury that if it found defendant had attempted to suppress evidence, such an attempt "could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior." (*Jackson*, *supra*, 13 Cal.4th at p. 1224.)  The jury did not need to know how to consider such evidence against Bond and Benjamin because they were not on trial. Defense counsel was nonetheless free to argue that the activities of Bond and Benjamin following the murder demonstrated their consciousness of guilt.

---

[27]  Defendant notes that many of this court's cases have cited the cautionary nature of the instruction.  (See, e.g., *Jackson*, *supra*, 13 Cal.4th at p. 1224 [the "cautionary nature of the instruction[] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory"].)  Defendant asserts we abandoned this "rationale" in *People v. Seaton* (2001) 26 Cal.4th 598, 673, when we held that error in *not* giving a consciousness of guilt instruction was harmless because the instruction "would have benefited the prosecution, not the defense."  It is not, however, inconsistent to observe that an instruction that informs the jury it may consider certain evidence as tending to show a consciousness of guilt benefits the prosecution while at the same time noting that language in the instruction limiting that consideration protects the defendant.

### b.  *Other challenges to instructions*

Defendant challenges CALJIC No. 2.90 (5th ed. 1988), the standard reasonable doubt instruction at the time of trial.  He contends that the terms "moral evidence" and "moral certainty" in that instruction are "not commonly understood terms."  "[T]he United States Supreme Court upheld this instruction, despite concerns about its language (*Victor v. Nebraska* (1994) 511 U.S. 1)," as has this court.  (*Zambrano*, *supra*, 41 Cal.4th at p. 1156.)

Defendant further contends that instruction in the language of CALJIC Nos. 2.01 and 2.02 (circumstantial evidence), in combination with CALJIC No. 2.90, undermined the requirement of proof beyond a reasonable doubt because it compelled the jury to find defendant guilty on all counts and the special circumstance allegation true using a standard lower than proof beyond a reasonable doubt, and created an impermissible mandatory presumption that required the jury to accept any reasonable incriminatory interpretation of the circumstantial evidence unless defendant rebutted the presumption by presenting the jury with a reasonable exculpatory explanation.  We have previously rejected similar contentions, and do so again here.  (*People v. Parson* (2008) 44 Cal.4th 332, 358; *People v. Morgan* (2007) 42 Cal.4th 593, 620.)

Defendant also contends that instruction in the language of CALJIC Nos. 1.00, 1.02 (modified),[28] 2.21.2, 2.22, 2.27, 2.50 (modified),[29] 2.51, 8.20, and 8.67 individually and collectively diluted the reasonable doubt standard because it urged the jury to decide material issues by determining which side had presented relatively stronger evidence, and thus implicitly replaced the beyond a reasonable

---

[28]  The modified CALJIC No. 1.02 instruction, which referenced the testimony of Bradley Nelson, is set forth *ante*, at pages 48-49.

[29]  The modified CALJIC No. 2.50 is set forth *ante*, at pages 39-40.

70

doubt standard with a preponderance of the evidence test. We have previously rejected similar arguments as to many of these instructions, noting that CALJIC Nos. 1.00, 2.21.2, 2.22, 2.27, and 2.51 are unobjectionable when, as here, they are " 'accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof.' " (*People v. Kelly* (2007) 42 Cal.4th 763, 792 (*Kelly)*; see *People v. Lindberg* (2008) 45 Cal.4th 1, 33-35 [there is no reasonable likelihood CALJIC No. 2.50, when considered with other instructions, would lead the jury to believe the prosecution was not required to prove all elements of the murder and the special circumstance allegation beyond a reasonable doubt].) A similar analysis pertains to the language of CALJIC No. 1.02 as modified. Moreover, we have previously concluded that CALJIC No. 8.20, which defines deliberate and premeditated murder, does not dilute the prosecution's burden to prove guilt beyond a reasonable doubt. (*People v. Tate* (2010) 49 Cal.4th 635, 697-698.) For the same reasons, we reject defendant's challenge to CALJIC No. 8.67, which defines deliberate and premeditated attempted murder.

Defendant further contends that CALJIC Nos. 1.00, 1.02 (modified), 2.01, and 2.51 diminish the prosecution's burden by erroneously telling the jury it was to decide between guilt and innocence, instead of determining whether guilt had been proven beyond a reasonable doubt. We have rejected this argument as to CALJIC Nos. 1.00, 2.01, and 2.51, and the same reasoning applies to CALJIC No. 1.02 as modified. (*People v. Crew* (2003) 31 Cal.4th 822, 847-848.) CALJIC No. 2.51 (evidence of motive) does not shift the burden of proof to the defendant to show an alternative motive to that advanced by the prosecution. (*People v. Solomon* (2010) 49 Cal.4th 792, 827.) CALJIC No. 2.21.2 (witness willfully false in one material part) does not lighten the prosecution's burden of proof by allowing the jury to credit prosecution witnesses after finding only a mere

71

probability of truth in their testimony.  (*People v. Solomon*, at p. 827.)  CALJIC No. 2.27 (sufficiency of a single witness to prove a fact) does not suggest the defendant has the burden of proof.  (*People v. Brasure* (2008) 42 Cal.4th 1037, 1059.)  Finally, there is no reasonable likelihood a jury would understand the language "precluding the idea of deliberation" in CALJIC Nos. 8.20 and 8.67 as requiring the defendant to eliminate the possibility of premeditation.  (*Hartsch*, *supra*, 49 Cal.4th at p. 506.)

### C.  Penalty Phase Issues

#### 1.  *Challenges to the death penalty statute*

Defendant challenges California's death penalty statute on numerous grounds that we have repeatedly rejected.

Contrary to defendant's assertion, the death penalty statute is not unconstitutional because it does not require "unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence."  (*People v. Lynch* (2010) 50 Cal.4th 693, 766 (*Lynch*).)  Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard.  (*People v. Thomas* (2011) 51 Cal.4th 449, 506; *People v. Smith* (2007) 40 Cal.4th 483, 526.)  No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof.  (*People v. Taylor* (2009) 47 Cal.4th 850, 899; *People v. Bennett* (2009) 45 Cal.4th 577, 632.)  That certain noncapital sentencing proceedings may assign a burden of proof to the prosecutor does not mean the death penalty statute violates a defendant's rights

to equal protection or due process. (*People v. Rogers* (2006) 39 Cal.4th 826, 893 (*Rogers*); *People v. Manriquez* (2005) 37 Cal.4th 547, 590 (*Manriquez*).) Given the absence of any equal protection or due process violation, we reject defendant's further bald contention that the existence of any burden of proof in noncapital sentencing proceedings demonstrates the death penalty statute violates his right to be free from cruel and unusual punishment. The trial court need not instruct that there is a presumption of life. (*People v. Gamache* (2010) 48 Cal.4th 347, 407.)

### 2. *Asserted instructional error*

#### a. *Challenges to CALJIC No. 8.88*

Defendant challenges the court's instruction under the language of CALJIC No. 8.88 on grounds we have repeatedly rejected. Contrary to his assertion, the language "so substantial" and "warrants" in that instruction is not impermissibly vague. (*Jackson*, *supra*, 13 Cal.4th at p. 1243.) Nor, as he further contends, does the instruction imply that if the aggravating evidence is "so substantial in comparison with the mitigating circumstances" that death is the only available sentence. (*Id*. at pp. 1243-1244.) The instruction is not constitutionally flawed because it fails to inform the jury that if it determines the mitigating factors outweigh the aggravating factors, it is required to return a sentence of life imprisonment without the possibility of parole. (*Id*. at p. 1243.)

#### b. *Challenges to CALJIC No. 8.85*

Defendant challenges CALJIC No. 8.85, which instructs the jury on the factors set forth in section 190.3, on various grounds we have repeatedly rejected. Thus, "we reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death." (*Dykes*, *supra*, 46 Cal.4th at p. 813; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975-976, 978-979.) We further reject the contentions that

73

admission of evidence regarding a defendant's unadjudicated criminal activity is constitutionally impermissible; section 190.3, factor (b), as written or interpreted by this court, fosters arbitrary and capricious application of the death penalty; and the jury should be instructed that it must unanimously find such evidence true beyond a reasonable doubt. (*People v. Martinez* (2010) 47 Cal.4th 911, 968; *Rogers*, *supra*, 39 Cal.4th at p. 894; *People v. Cain* (1995) 10 Cal.4th 1, 69-70.) Moreover, "[u]se of the same jury that has adjudged a defendant guilty of first degree murder with special circumstances to determine at the penalty phase whether he or she committed unadjudicated criminal acts does not violate the impartial-jury requirement of the Sixth Amendment." (*Rogers*, at p. 894.)

The trial court was not required to delete inapplicable factors from the instruction (*People v. Watson* (2008) 43 Cal.4th 652, 701), or "instruct that the jury can consider certain statutory factors only in mitigation." (*People v. Valencia* (2008) 43 Cal.4th 268, 311.) Nor is there a reasonable likelihood the jury would conclude that the absence of evidence of a mitigating factor was aggravating. (*People v. Jackson* (2009) 45 Cal.4th 662, 694-695.) Use of the adjectives "extreme" and "substantial" in section 190.3, factors (d) and (g) is constitutional. (*People v. Valencia*, at p. 311.) The federal Constitution does not require the jury to make " 'written findings of the factors it finds in aggravation and mitigation.' " (*Dykes*, at p. 813.)

### c. Refused defense instructions

Defendant requested two instructions.[30] The court declined to give Instruction B because it was adequately covered by existing instructions, and

---

[30] The proposed instructions provided:

*(footnote continued on next page)*

74

declined to give both Instructions B and C because they were argumentative. There was no error. The failure to instruct the jury that a mitigating factor does not have to be proved beyond a reasonable doubt but may be found to exist if there is any evidence to support it, as requested here, or on the lack of need for unanimity on the existence of mitigating factors, does not impermissibly foreclose full consideration of the mitigating evidence or lead to arbitrary results. Instruction "in the language of CALJIC No. 8.85 allowed consideration of 'any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.' "

_____

*(footnote continued from previous page)*

"The mitigating circumstances that I have read for your consideration are given as examples of some of the factors that a juror may take into account as reasons for deciding not to impose a death sentence in this case. A juror should pay careful attention to each of those factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case. But a juror should not limit his or her consideration of mitigating circumstances to these specific factors. [¶] A juror may also consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty. [¶] A mitigating circumstance does not have to be proved beyond a reasonable doubt. A juror may find that a mitigating circumstance exists if there is any evidence to support it no matter how weak the evidence is. [¶] Any mitigating circumstance may outweigh all the aggravating factors. [¶] A juror is permitted to use mercy, sympathy and/or sentiment in deciding what weight to give each mitigating factor." (Instruction B.)

"If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject death as a penalty. A mitigating factor does not have to be proved beyond a reasonable doubt. A juror may find that a mitigating circumstance exists if there is any evidence to support it no matter how weak the evidence is." (Instruction C.)

75

(*Avila*, *supra*, 46 Cal.4th at p. 722.)  There is no reasonable likelihood the jury understood the instructions to mean that mitigating evidence had to be proved beyond a reasonable doubt or that unanimity was required for the existence of mitigating factors.  (*Lynch*, *supra*, 50 Cal.4th at pp. 765-766 [trial court properly refused to give an instruction similar to defendant's proposed instruction C]; *People v. Lewis* (2009) 46 Cal.4th 1255, 1317; *Avila*, at p. 722 [trial court properly refused to give an instruction substantially similar to defendant's proposed instruction B].)  Thus, "[n]o additional instructions were required." (*Kelly*, *supra*, 42 Cal.4th at p. 799.)

### 3. *Failure to provide intercase proportionality*

Defendant contends intercase proportionality review is constitutionally required.  We have repeatedly rejected this claim.  (*Stevens*, *supra*, 41 Cal.4th at p. 212; see *Pulley v. Harris* (1984) 465 U.S. 37, 50-51.)  "Nor does the circumstance that intercase proportionality review is conducted in noncapital cases cause the death penalty statute to violate defendant's right to equal protection and due process."  (*Farley*, *supra*, 46 Cal.4th at p. 1134.)  "[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law."  (*Manriquez*, *supra*, 37 Cal.4th at p. 590.)

### 4. *Asserted violation of international law*

Defendant contends that his sentence of death violates international law.  We have found no violations of law that preclude imposition of the death penalty in this case, and defendant "points to no authority that 'prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' "  (*Stevens*, *supra*, 41 Cal.4th at p. 213.)

76

### 5. *Effect of vacating special circumstance finding*

Defendant contends that if we vacate the special circumstance finding that he committed the murder while engaged in the attempted commission of oral copulation, his death judgment must be reversed. We have not vacated this special circumstance finding.

### 6. *Asserted cumulative error*

Defendant contends that cumulative guilt and penalty phase error requires reversal. We have found no error. Moreover, where we have assumed error, we have found no prejudice. Nor do we discern cumulative prejudice.

## III. CONCLUSION

We affirm the judgment.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Dement

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S042660
**Date Filed:** November 28, 2011

_____

**Court:** Superior
**County:** Fresno
**Judge:** Stephen R. Henry

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and William T. Lowe, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Patrick J. Whalen and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

William T. Lowe
Deputy State Public Defender
221 Main Street, Tenth Floor
San Francisco, CA  94105
(415) 904-5600

Jeffrey D. Firestone
Deputy Attorney General
1300 I Street
Sacramento, Ca  94244-2550
(916) 324-5168