Filed 8/5/13  P. v. Sanchez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MIGUEL MEDINA SANCHEZ,<br><br>        Defendant and Appellant. | D062131<br><br><br>(Super. Ct. No. SCE309528) |

APPEAL from a judgment of the Superior Court of San Diego County, Lantz Lewis, Judge.  Affirmed.

Robert Franklin Howell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Steve Oetting, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted Miguel Medina Sanchez of second degree murder (Pen. Code, § 187, subd. (a)),[1] with a true finding that he used a deadly and dangerous weapon (§ 12022, subd. (b)(1)). The trial court sentenced Sanchez to prison for a indeterminate term of 15 years to life and an additional one-year determinate term.

Sanchez contends (1) the trial court erroneously admitted his statements to police in violation of the Fifth Amendment pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); and (2) the trial court should have instructed the jury with the lesser included offense of voluntary manslaughter on the theory that he committed the killing without malice during the commission of an inherently dangerous felony. We conclude that Sanchez's arguments are without merit, and we accordingly affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Sanchez worked as a gardener on a 16-acre property owned by Fernando Lazano and lived in a small shack on the property. Maria Irma De Rubio, who was Sanchez's girlfriend, told Lazano on March 8, 2011, that she was going to be staying in the shack with Sanchez because Sanchez felt sick.

On March 10, Sanchez spoke to Lazano and told him that he wasn't sleeping well because he was having frightening dreams that the devil was taking him away. Sanchez also told Lazano that he had found hallucinogenic mushrooms growing on the property and had eaten them.

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

2

The next day, March 11, at 4:30 a.m., Lazano received a telephone call from De Rubio, who told him that Sanchez did not recognize her. Around 9:30 a.m., Lazano saw Sanchez walking on the property with his shirt off, but did not speak with him.

Shortly after 11:00 a.m. on March 11, a neighbor noticed Sanchez in the backyard of a home approximately five miles away from Lazano's property. Sanchez was talking to himself, singing and moving around the patio furniture. He then turned on the garden hose and drenched himself while still fully clothed. The neighbor called the police, and when police officers responded to a call of a possible burglary in progress, they found Sanchez sitting in the backyard still pouring water over himself from the hose and talking to himself. The police officers moved Sanchez to the front curb and handcuffed him while waiting for a Spanish-speaking officer to arrive to speak with Sanchez.

Deputy Sheriff Francisco Acero arrived and asked Sanchez questions in Spanish. When Deputy Acero asked if Sanchez was feeling okay, Sanchez answered, "She put a spell on me but I showed her." Deputy Acero asked who cast the spell, but Sanchez did not answer. Deputy Acero asked whether Sanchez wanted to hurt himself. Sanchez stated, "She put a spell on me, but I showed her. That's why I killed her." Sanchez stated, "I beat her and I killed her." Sanchez then started to pray.

Sanchez was arrested and taken to a hospital for psychiatric observation after convulsing on the way to the police station. A test for illegal drugs was negative, but the hospital did not test for the presence of hallucinogenic mushrooms.

The next morning, March 12, Lazano went to Sanchez's shack to look for Sanchez, and found De Rubio's dead body in a pool of blood on the floor. De Rubio had been

3

stabbed 12 times in the head and the torso.  She also had numerous blunt force injuries to her head and face, several bite marks on her body and had been sexually assaulted.

After determining that Sanchez was a suspect, police officers tracked him down at the hospital.  DNA evidence on De Rubio's bite marks and collected during a sexual assault examination of De Rubio tied Sanchez to the killing, as did Sanchez's bloody fingerprint at the scene and a bloody shoe print matching Sanchez's shoes.

Sanchez was charged with the murder of De Rubio.  A jury found him guilty of second degree murder (§ 187, subd. (a)), with a true finding that he used a deadly and dangerous weapon (§ 12022, subd. (b)(1)).

II

DISCUSSION

A.    *The Trial Court Did Not Prejudicially Err by Denying the Motion to Exclude the Statements That Sanchez Made in Response to Questions by Deputy Acero*

During trial, the court denied defense counsel's motion to exclude the statements that Sanchez made to Deputy Acero on the ground that Sanchez was not advised of his *Miranda* rights before Deputy Acero questioned him.  Sanchez contends that the trial court prejudicially erred by denying the motion.

"On appeal from the denial of a *Miranda* exclusionary motion, we defer to the trial court's factual and credibility findings if supported by substantial evidence, and independently determine whether the challenged statements were illegally obtained." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 88 (*Andreasen*).)  As it is primarily a factual determination, "[w]e review the trial court's finding regarding whether

4

interrogation occurred for substantial evidence or clear error. (*People v. Clark* (1993) 5 Cal.4th 950, 985 (*Clark*).)

The applicable law is well-settled. "*Miranda v. Arizona*, *supra*, 384 U.S. 436, and its progeny protect the privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed." (*People v. Gamache* (2010) 48 Cal.4th 347, 384.) Statements obtained in violation of *Miranda* are generally inadmissible to establish guilt. (*People v. Sims* (1993) 5 Cal.4th 405, 440.)

Here, there is no dispute that Sanchez was in custody at the time of his statements to Deputy Acero and that he had not been advised of his *Miranda* rights. Thus, the only disputed issue for us to resolve in determining whether Sanchez made the statements in response to custodial interrogation requiring a *Miranda* advisement is whether Sanchez was subject to *interrogation* by Deputy Acero.

"Interrogation has a specific meaning as used in *Miranda* . . . ." (*Clark*, *supra*, 5 Cal.4th at p. 985.) "'"[I]nterrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police *should know are reasonably likely to elicit an incriminating response from the suspect*. . . .' [Citation.] 'Clearly, not all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.'" (*People v. Dement* (2011) 53 Cal.4th 1, 26, italics added (*Dement*).)

5

"'In deciding whether police conduct was "reasonably likely" to elicit an incriminating response from the suspect, we consider primarily the perceptions of the suspect rather than the intent of the police.'" (*People v. Enraca* (2012) 53 Cal.4th 735, 754.) "'This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.'" (*People v. Haley* (2004) 34 Cal.4th 283, 300 (*Haley*).) However, "[t]his is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 302, fn. 7 (*Innis*).) "To determine defendant's likely perception, the statement at issue must be considered in context." (*Enraca*, at p. 754.)

In this case, after holding an exclusionary hearing at which Deputy Acero testified, the trial court determined that there was no "interrogation aimed at eliciting an incriminating statement," and it was "still at the investigative stage." The trial court explained, "It is my belief it was investigatory . . . and it does not cross over the threshold into a course of interrogation." The trial court accordingly denied the motion to exclude Sanchez's statements to Deputy Acero. As we will explain, we find no error in the trial court's ruling.

6

As Deputy Acero testified during the exclusionary hearing, he asked Sanchez several questions. [2] Those questions were, "'Who are you?'"; "'Where are you from?'"; "'What are you doing here?'"; and "Are you 'feeling okay?'" In light of the fact Sanchez had been detained in response to the report of a possible residential burglary, the only one of these questions that could possibly elicit an incriminating response was "What are you doing here?" Specifically, Sanchez might have responded with information suggesting he intended to burglarize the house. However, the other three questions were not reasonably likely to elicit an incriminating response because they either covered general biographical information (Sanchez's name and place of origin) or inquired about Sanchez's welfare ("Are you 'feeling okay?'").

Further, even if the question about what Sanchez was doing at the house could have elicited an incriminating response, in this case it did not, and Sanchez did not seek to exclude his response to that question. Indeed, to Deputy Acero's question, "What are

---

[2]    Deputy Acero's description during the exclusionary hearing of the questions he asked Sanchez and the responses he received differed somewhat from the description he later gave when testifying before the jury. The main difference between the two descriptions is that, at trial, Deputy Acero stated that he also asked whether Sanchez wanted to hurt himself after asking whether Sanchez was feeling okay, to which Sanchez answered, "She put a spell on me, but I showed her. That's why I killed her," and that at some point Sanchez also stated, "I beat her and I killed her." In reviewing the trial court's ruling on the motion to exclude evidence, we will focus our analysis on Deputy Acero's description during the exclusionary hearing of his interaction with Sanchez. However, the outcome of our analysis would be the same were we to focus on the description that Deputy Acero gave to the jury of his interaction with Sanchez. The question about whether Sanchez wanted to hurt himself — which Deputy Acero described to the jury — is a question about Sanchez's welfare, not a question that could reasonably be expected to elicit an incriminating response.

you doing here?" Sanchez responded that he was hungry.   Only when Deputy Acero asked Sanchez whether he was "feeling okay," did Sanchez volunteer the incriminating statement, "She put a spell on me.  I choked her."[3]  Thus we focus on the question "Are you 'feeling okay?'" to determine whether the response to that question should have been suppressed pursuant to *Miranda*.

As we have explained, the relevant legal inquiry is whether in asking "Are you 'feeling okay?'" Deputy Acero should have known that the question was " 'reasonably likely to elicit an incriminating response from the suspect.'" (*Dement*, *supra*, 53 Cal.4th at p. 26.)  We conclude that Deputy Acero's question to Sanchez "Are you 'feeling okay?'" is *not* a question that any reasonable police officer would expect to elicit an incriminating statement.  It is plainly a question about Sanchez's welfare that calls for an answer describing Sanchez's condition, not the confession to a crime.  Indeed, because De Rubio's murder had not even been discovered at the time Deputy Acero was questioning Sanchez, no reasonable police officer would have suspected that Sanchez would confess to a murder in response to a question about his welfare.

Sanchez's statement that he had choked someone was such a nonsequitor to the question "Are you 'feeling okay?'" that it is similar to a voluntary spontaneous confession.  " 'Nothing in *Miranda* is intended to prevent, impede, or discourage a guilty

---

3      According to the reporter's transcript, Deputy Acero testified during the exclusionary hearing that Sanchez stated, "I choked her," but during Deputy Acero's testimony before the jury, he reported Sanchez as saying, "I showed her."  The distinction is not important to our analysis.

8

person, even one already confined, from freely admitting his crimes, whether the confession relates to matters for which he is already in police custody or to some other offense. . . . "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment" or subject to the prophylactic requirements of *Miranda*.'" (*Haley*, *supra*, 34 Cal.4th at p. 303.)

Sanchez contends that the trial court erred because it applied an improper standard for deciding whether interrogation occurred. According to Sanchez, the trial court analyzed whether Deputy Acero's questions were "*subjectively* intended by him to elicit incriminating responses" rather than whether "*objectively* viewed, it is 'reasonably likely' that the questions may produce incriminating evidence." (Italics added.) We disagree. In explaining its ruling, the trial court stated that there was no "interrogation aimed at eliciting an incriminating statement," that "it was investigatory . . . and it does not cross over the threshold into a course of interrogation." As we have noted, the subjective intent of the investigating officer is relevant — although not dispositive. (*Innis*, *supra*, 446 U.S. at p. 302, fn. 7.) The trial court did look to Deputy Acero's subjective intent to some extent, as it inquired whether the questions were "aimed" at eliciting an incriminating response — and stated that "[t]he sequence of events are, I think, kind of logical in terms of the police officer trying to figure out what is going on, not trying to get the individual in trouble . . . ." However, we see no indication that the trial court focused *solely* on the subjective intent of Deputy Acero and thus misapprehended the applicable legal standard. Further, any error in the trial court's analytical approach would not require reversal. On

9

our independent review (*Andreasen*, *supra*, 214 Cal.App.4th at p. 88) we have — as described above — applied the appropriate legal standard to the facts in the record and have determined that Sanchez's statements were not made in response to a question "'reasonably likely to elicit an incriminating response.'" (*Dement*, *supra*, 53 Cal.4th at p. 26.)

B.    *The Trial Court Did Not Err in Failing to Instruct on Voluntary Manslaughter as a Lesser Included Offense*

Sanchez contends that the trial court should have instructed on voluntary manslaughter as a lesser included offense to the murder for which he was charged. Relying on *People v. Garcia* (2008) 162 Cal.App.4th 18, 31 (*Garcia*), Sanchez argues that "[a]n unintentional killing during the commission of an inherently dangerous felony constitutes voluntary manslaughter." According to Sanchez, the facts could have supported a finding that he committed a dangerous felony assault on De Rubio with a knife but — because he was in a delusional state — did not intend to kill her.

Sanchez's argument fails because — after Sanchez filed his appellate brief — our Supreme Court disapproved the holding of *Garcia* and established that "a killing without malice in the commission of an inherently dangerous assaultive felony is *not* voluntary manslaughter." (*People v. Bryant* (2013) 56 Cal.4th 959, 971, italics added.) As our

10

Supreme Court explained, "A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life. To the extent that *People v. Garcia*, *supra*, 162 Cal.App.4th 18, suggested otherwise, it is now disapproved." (*Bryant*, at p. 970.)

Accordingly, the trial court did not err by failing to instruct on voluntary manslaughter.

DISPOSITION

The judgment is affirmed.

_____<br>IRION, J.

WE CONCUR:

_____<br>HUFFMAN, Acting P. J.

_____<br>NARES, J.

11